GREEN, Administratrix, Respondent, vs. ASHLAND WATER COMPANY, Appellant.

*November 3 — November 22, 1898.*

*Public water supply: Warranty of purity: Liability of water company: Negligence or fraud: Contributory negligence: Knowledge of impurity: Presumption: Evidence: Expert testimony.*

1. A waterworks company, operating under a franchise from, and contract with, a municipal corporation, in distributing water for public and domestic use, is not responsible as an implied warrantor of the purity of the water distributed by it.

2. If a waterworks corporation knowingly supply to its customers water contaminated with impurities so as to render it dangerous for domestic use, under such circumstances that its customers are liable to use the water in ignorance of the danger, it owes to such customers the duty of disclosing such danger, and a failure in that regard renders the corporation liable in damages to a customer injured by the use of such water without contributory fault on his part amounting to a want of ordinary care, and the liability may be placed on the ground of either actionable negligence or fraud.

Green vs. Ashland Water Co.

3. In the circumstances stated in the foregoing, whether the liability be placed on the ground of negligence or fraud, knowledge or reasonable means of knowledge of the condition of the water, on the part of the injured person, will preclude a recovery.

4. In an action for damages, attributed to the negligence of another, evidence of precautions taken to prevent injuries of like character after the happening of the one complained of, is inadmissible, and likewise is evidence as to the situation after the injury, unless preceded by *prima facie* proof that no change has taken place in the meantime.

5. The admission in evidence of newspaper publications, and proceedings of public bodies, consisting in the main of declarations and statements irrelevant to the issue, and manifestly tending to inflame and prejudice the minds of the jury, though containing some evidence which, standing alone, may be properly received, is prejudicial error.

6. Opinion evidence based on disputed evidentiary facts, not the subject of scientific investigation, is not admissible except in response to properly framed hypothetical questions.

7. Where the only point as to which opinion evidence is directed is properly a matter of scientific investigation, an expert in that line may testify directly thereto from personal investigation.

8. If a water company's source of supply be contaminated with sewage for a long period of time, causing epidemics of typhoid fever annually in the community for several years, and the facts in that regard be there notorious and a matter of common knowledge, the presumption is that members of such community of ordinary intelligence have notice of that situation, and, in the absence of evidence to the contrary, that presumption will prevail and preclude a recovery by a person injured by the use of such water, on the ground of his contributory fault.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Portage county: CHAS. M. WEBB, Circuit Judge. *Reversed.*

Action to recover damages for the death of plaintiff's intestate alleged to have been caused by negligence on defendant's part, in that it failed and neglected to extend its intake pipe into Chequamegon Bay from time to time as needed to secure water free from sewage contamination and suitable for domestic use, as required by its contract with

the municipality of Ashland. It was claimed that, owing to the breach of duty mentioned, in March, 1894, defendant took from Chequamegon Bay water contaminated with typhoid fever germs and distributed the same to its customers in the city of Ashland, of whom the deceased was one; that without fault on his part he used such polluted water taken from the service faucet at his residence, for drinking purposes, and was thereby stricken with typhoid fever from which he died. The facts mentioned were properly alleged in the complaint and put in issue by the answer.

The facts established conclusively by admissions in the pleadings or evidence given on the trial were, that the contract under which defendant's waterworks system was constructed and operated was made in 1884; that there was then no sewerage system in Ashland; that the contract required defendant to take its water supply from Chequamegon Bay and to extend the intake pipe in the bay from time to time, as the growth of the city of Ashland might require, to keep the water free from contamination by the sewage from such city; that three years after the waterworks system was installed there was constructed a sewerage system in Ashland by which the sewage of the city was deposited in the bay, and such system was extended from time to time, and the amount of the sewage thereby, and by the growth of the city, deposited in the bay from year to year down to the time of the occurrence complained of, was so increased that, with pollutions of like character which were drained into the bay from other sources, it was rendered practically impossible to secure therein with certainty, at all seasons of the year, a water supply suitable for domestic use; that as a result of the situation, for several years prior to the spring of 1894, at about the time of the break-up in the spring, there was an epidemic of typhoid fever in Ashland from using the bay water; that as early as 1891 it was generally accepted as true by the people of the city that the

water of the bay was contaminated with typhoid fever germs and was the cause of the prevalence of typhoid fever, especially in the spring; that the danger of taking the fever from using such water in the spring was notorious in 1894, and for some time prior thereto; that the subject was one generally talked about among the people and was discussed in the city press which was patronized by the intestate; that he had been a resident of the city for several years, was an intelligent working man, and his attention had been specially drawn to the subject of typhoid fever by reason of his wife having been afflicted with it about six months prior to his sickness; that he knew the source of defendant's water supply, and used the water freely without any effort to free it from dangers of sewage contamination.

The evidence further shows that deceased was away from home all of the time for about four days prior to his sickness becoming so pronounced as to require him to desist from working, and that prior to such four days he was absent from home during the working time of each day. There was considerable evidence given by experts for the purpose of showing the condition of the bay water, and the probability that the death of the intestate was caused by using it. Numerous exceptions were taken to the rulings on questions propounded to the experts and to other rulings on the admission and rejection of evidence.

At the close of plaintiff's case there was a motion for a nonsuit made and denied, and the question raised by such motion was again raised by a motion to direct a verdict in defendant's favor at the close of the evidence on both sides. The jury rendered a special verdict finding, among other things, that the deceased died from typhoid fever caused by drinking water drawn from the faucet in his house; that typhoid fever was epidemic in the city in 1892 and 1893, and that defendant knew, or ought to have known, that the water it furnished was dangerously contaminated with ty-

phoid fever germs; that it could have procured wholesome water from Chequamegon Bay prior to the sickness of the deceased; that the deceased was without fault in using the water, and that it was publicly and widely stated and believed among the citizens of Ashland, prior to the occurrence complained of, that the typhoid fever epidemics in the city of Ashland were attributable to the water furnished by the defendant. All other issues requisite to plaintiff's recovery were found in her favor, and the damages assessed at $5,000.

There was a motion for a new trial made after verdict, sufficiently broad to present all questions necessary to be preserved thereby. Proper exceptions were taken to all rulings of the court adverse to the defendant. Defendant appealed.

For the appellant there were separate briefs by *Tomkins & Merrill*, attorneys, and *Lamoreux & Shea*, of counsel, and oral argument by *C. A. Lamoreux* and *W. M. Tomkins*.

For the respondent there was a brief by *Cate, Sanborn, Lamoreux & Park*, and oral argument by *B. B. Park*. They contended, *inter alia*, that the defendant company was guilty of a want of ordinary care which proximately caused the death of Green. The relation between Green and defendant was contractual. *Britton v. Green Bay & Ft. H. W. W. Co.* 81 Wis. 48. In the following cases some material fact like notice of the danger brought home to the defendant, or the entire absence of any duty to the person injured, resulted in a judgment for the defendant, but in each case the liability of the defendant on a proper showing is freely and fully admitted. They constitute all of the decisions we have been able to find where liability is sought to be imposed for death from disease-infected water furnished the public, as the defendant in this case supplied the city of Ashland. *Buckingham v. Plymouth W. Co.* 142 Pa. St. 221; *Danaher v. Brooklyn*, 119 N. Y. 241, 7 L. R. A. 592; *Milnes v. Huddersfield*, 10 Q. B. Div. 124, 12 id. 443. The ac-

tion is purely and simply for the tort of the defendant, and the duty to the deceased which the defendant negligently failed to perform is based upon contract. *Coy v. Indianapolis G. Co.* 146 Ind. 655. See, also, 2 Dillon, Mun. Corp. § 985*a; Kliegel v. Aitken,* 94 Wis. 432; Thomas, Neg. 998, 1027. A company undertaking to supply the inhabitants of a municipality with water for domestic purposes for a valuable consideration should be held to impliedly warrant the water it so furnishes as pure, wholesome, and fit for that purpose. 10 Am. & Eng. Ency. of Law, 157; *Lukens v. Freiund,* 27 Kan. 664; *Hunter v. State,* 73 Am. Dec. 165; Benjamin, Sales, § 673*a; Graft v. Parker Webb & Co.* 21 L. R. A. 139.

Marshall, J. This action was brought, tried, submitted to the jury, and went to judgment, upon the theory, apparently, that a recovery was claimed for the death of plaintiff's intestate on the ground of actionable negligence of defendant. Something is said in the briefs of counsel about the rule, so called, of implied warranty in the sale of provisions for immediate domestic use, as if that rule might apply to the facts. It is not necessary to consider that theory because of the manner in which the case was tried and submitted, as indicated, though it is proper, and deemed advisable as a guide in future proceedings, to discuss it. The doctrine of Sir William Blackstone that there is a warranty of the wholesomeness of provisions sold for domestic use by the buyer, and that the vendor is bound to know their quality in that regard at his peril, is controverted by the weight of authority in this country and England. Liability for damages in the circumstances mentioned is supported, but on the ground of deceit, not contract. It would be interesting, and probably constitute a valuable addition to our jurisprudence, to have the true nature of that liability definitely decided here. The writer is not familiar with any case where

the point has been so presented and decided that the result stands as a binding adjudication on the subject, though there are *dicta* here and there recognizing the rule stated by Blackstone as one prevailing in this country generally. *Getty v. Rountree*, 2 Pin. 379; *Williams v. Slaughter*, 3 Wis. 347.

There is a strong reason for holding that *caveat emptor* applies to the purchases of provisions for domestic use the same as to purchases of other articles, in the absence of express contract or of fraud; that the only difference is that the situation and relation of the parties in the one case raises an inference of artifice, while in the other it does not. In *Emerson v. Brigham*, 10 Mass. 197, it is said, in substance, that the mistake of Blackstone was in treating deceit and fraud as breach of implied contract; that artifice must be established as the foundation of liability, and without it no liability in the nature of that on an implied warranty exists in case of the sale of provisions any more than in the sale of any other article; that the sale of provisions for a sound price for immediate consumption involves a representation of wholesomeness, and knowledge of the falsehood, if falsehood there be, is presumed from the nature of the transaction and duties growing out of the trade; that the inference of fraud arises from the necessities of the situation, and to the deceit attaches the liability. That was affirmed in *Winsor v. Lombard*, 18 Pick. 57, where Chief Justice Shaw stated, in effect, that the supposition as to the rule of implied warranty existing in the sale of provisions any more than in the sale of other articles, is founded in failure to distinguish between a rule of evidence and a rule of law, as explained in Mr. Justice Sewall's opinion in *Emerson v. Brigham*. In *Moses v. Mead*, 1 Denio, 378, Bronson, C. J., speaking on the same subject, said that the *dictum* of Blackstone cannot be supported in its full extent; that the liability can be supported, but on the ground of deceit, citing *Emerson v. Brigham* with approval, and distinguishing *Van Bracklin v.*

*Fonda,* 12 Johns. 467, a leading case often cited to the implied warranty theory and as sustaining the *dictum* of Blackstone. A careful reading of it shows that the sale considered was with actual knowledge of the vendor of the unwholesomeness of the article. He was guilty of a fraud and liable on that ground, and that was the real foundation of the recovery. See further, to the same effect, *Giroux v. Stedman,* 145 Mass. 439, and *Burnby v. Bollett,* 16 Mees. & W. 644. A careful examination of the text-books on this subject shows that the writers reason along the line of *Emerson v. Brigham* and the other cases cited. Benj. Sales (ed. 1892), 647; Biddle, Warranties, §§ 193–204; 2 Schouler, Pers. Prop. § 348; 10 Am. & Eng. Ency. of Law, 157.

Courts in recent years have not been inclined to add new exceptions to the rule of *caveat emptor,* or to extend those already established. It once applied to all sales of personal property, with the one exception of warranty of title. Many exceptions have since been added, presumably under the influence of the civil law, where the rule was *caveat venditor,* a rule as harsh to the seller as that of the common law to the buyer. Each exception in the development of our system paved the way for another, and that for still another, as the exigencies of particular situations seemed to require, in order to harmonize moral with legal obligations, till the rule itself ceased to be the safe and simple guide it was when Justice Popham, in pronouncing the law in his time, said, "If I have commodities which are damaged, whether victuals or otherwise, and I, knowing them to be so, sell them for good and affirm them to be so, an action upon the case lies for deceit; and although they be damaged, if I, knowing not that, affirm them to be good, still no action lies without I warrant them to be good." That a more enlightened sense of justice has softened and limited that rigorous rule, is by no means to be regretted; but if a written system of laws is to be preserved at all, and the science of the law is to be found

therein, so many exceptions and limitations of a principle should not be recognized as to practically obscure it. To the one implied warranty of title, with which the rule of the common law, as indicated, commenced, has been added that in case of a sale by sample, warranty of general character where the chattel is not present and subject to inspection, warranty of manufactured goods as to merchantable quality, warranty that manufactured goods sold for a particular purpose are reasonably suitable therefor, and perhaps some others. None of the changes, however, have taken place in recent times, and as the remedy is ample to protect against frauds on the part of vendors where the vendees use reasonable care in looking after their own interests, our system, without further changes, is probably as perfect to the end that even-handed justice between individuals may be guaranteed, as it can reasonably be.

In the light of the foregoing, no reason is perceived for saying that a mere distributor of water for a compensation should be held liable as a guarantor of its quality. It is not a commodity kept for sale in the strict sense of the term, but is free to every one, in nature's reservoirs, like light and air. It is taken directly or indirectly from a common source of supply. The immediate source, as in this case, is usually selected in advance and fixed by contract, leaving the mere service of a carrier to be performed, of taking the water from such source and distributing it to the consumers. To say that the person or corporation performing that service shall be burdened with an implied warranty of the quality of the thing carried and distributed, would be treating the transaction as a sale, strictly so called, and then applying an exception to the doctrine of *caveat emptor* not supported by good reason, or any authority we are able to find, or any to which our attention has been called. It would burden such public service in a way that would be destructive of private enterprise in that line, and render public enterprise

Green vs. Ashland Water Co.

in the same direction so attended with dangers as to discourage a service that has become a necessity in all communities of any considerable size, and which promotes to a high degree the welfare and happiness of individuals in communities great or small. If distributors of water under public franchises be held strictly accountable for the exercise of ordinary care not to place before their customers an unwholesome article under circumstances liable to induce persons, in the exercise of ordinary care, to use it for drinking or other domestic purposes in ignorance of the dangers attending the use, and held liable for deceit in such transactions, and the law be firmly administered along those lines, the safety of individuals, as affected by public water service, will be as well promoted as is consistent with the continuance of such service, whether performed by strictly public or by *quasi*-public agencies.

From the foregoing it will be seen that if a recovery can be sustained on the facts of this case at all, it must be on the ground of actionable fraud or negligence without contributory fault on the part of the deceased. If defendant knew, or from the situation ought to have known, the water it was distributing in the city of Ashland was dangerous for domestic use, from some cause not discoverable ordinarily by the exercise of reasonable care, it owed the duty to its customers of disclosing that danger, and a failure so to do, knowing that such customers were liable to use the water through ignorance of its character, was a fraud in law, rendering the defendant liable to legal damages to any person injured by such fraud without fault on his part, and it was also a failure of duty amounting to actionable negligence as well, to which the same liability is incident. The mere fact, if it be a fact, that it had been rendered impracticable for defendant to procure a supply of wholesome water in Chequamegon Bay, as required by the contract with the city, from causes attributable to the municipality, though constituting

a defense against any action on its contract with the city or to forfeit its franchise, does not excuse knowingly pumping contaminated water from the bay and distributing the same to customers and deceiving them into the belief that it was wholesome. But, as indicated, though the conduct of the defendant be held wrongful on the ground of either fraud or negligence, if the deceased knew, or under the circumstances ought to have known, the dangerous condition of the water, yet used it with the consequence complained of, no legal liability thereby attached to the defendant. If the deceased knew, and he is charged with knowledge of what a man of ordinary intelligence under the circumstances ought to have known, then he was not deceived, whatever may have been the conduct of the defendant; and for the same reason he is chargable with contributing to the result complained of, by his own want of care. So, plaintiff's cause of action, if any there be, sounds in tort however we may look at it, and knowledge, or its equivalent, on the part of the defendant, and want of such knowledge or equivalent on the part of the deceased, is essential to legal liability in the one case as well as the other, the only difference being in the manner of establishing the fault of the deceased, the affirmative of that being on the complainant if a recovery be sought on the ground of fraud, and on the defendant if on the ground of actionable negligence. The distinction between the two is exceedingly shadowy, and really not important in the practical application of principles.

The foregoing discussion and statement is deemed justified, if not called for, by the positions taken by counsel. If some of the principles contended for were applied on a new trial of the case, and it resulted favorably to the plaintiff, the misfortune of a reversal might probably follow. The danger in that regard may be avoided, guided by what has been said.

In considering the specific errors assigned, it appears

most logical to first take up the rulings complained of on the admission of evidence. First in order is that admitting proof that greater precautions to obtain pure water were taken by the defendant after the occurrence complained of than before. If defendant in fact knew the water supply was dangerously contaminated, the fact that it subsequently took means to correct the evil, as we have seen, is immaterial on that question, but the question of whether the water was impure, and whether defendant negligently failed to remedy the difficulty, were material, and determinable solely by the situation prior to the occurrence complained of. What was done afterwards had no legitimate bearing on that question, and the jury had no right to draw any inference therefrom. Such evidence has been repeatedly condemned by this and other courts. *Castello v. Landwehr,* 28 Wis. 522; *Anderson v. C., St. P., M. & O. R. Co.* 87 Wis. 195; *Downey v. Sawyer,* 157 Mass. 418; *Columbia & P. S. R. Co. v. Hawthorne,* 144 U. S. 202; *Baird v. Daly,* 68 N. Y. 547; *Nalley v. Hartford Carpet Co.* 51 Conn. 524; *Terre Haute & I. R. Co. v. Clem,* 123 Ind. 15; *Hodges v. Percival,* 132 Ill. 53; *Hudson v. C. & N. W. R. Co.* 59 Iowa, 581; *Motey v. Pickle M. & G. Co.* 74 Fed. Rep. 155.

What has been said on the subject of evidence of precautions against sewage contamination after the occurrence complained of, applies to evidence of experts, received against defendant's objection, as to tests made of water taken from the bay some time after such occurrence. For aught that appears, the water may have been wholesome in the early part of March, 1894, and very unwholesome when the subsequent tests were made. The evidence shows that the deceased took the fever about the 1st of March, and that the height of the typhoid fever epidemic was not reached till the last of that month, there being several hundred persons afflicted in all. Under the circumstances, sufficient time had elapsed for a material change in the bay water to have taken

place. The admission of the evidence was plainly prejudicial error. True, evidence of a situation existing after an injury, though a considerable time may have elapsed, is admissible to show the situation existing at the time of the injury, if preceded by *prima facie* proof that no change has taken place in the meantime. *Tremblay v. Harnden*, 162 Mass. 383. Here that preliminary proof not only was wanting, but there was a strong case to the contrary made by the evidence.

It is further assigned for error that the court allowed opinion evidence, as to facts in issue,— the evidentiary facts (not for scientific controversy) relating thereto being in dispute,— contrary to the settled law on the subject, and as declared in numerous decisions in this court, and recently stated in *Maitland v. Gilbert Paper Co.* 97 Wis. 476. The following are some of the questions complained of: "You may state whether or not, in your opinion, the water furnished by the *Ashland Water Company* during the winter and spring of 1894 had anything to do with the typhoid fever epidemic which prevailed in the city of Ashland during that time?" "What, in your judgment, was the cause of the typhoid fever of which he [Green] died?" "You say the typhoid fever in this case, in your opinion, was caused by drinking bay water: Do you say that from the investigations you made?" All the questions were answered in the affirmative. The learned counsel for respondent say in support of the questions, that they were proper because the effect of evidence produced in establishing controverted facts, on which opinions were given, was not involved,— that such facts were not in dispute. We are unable to see the case that way. How can it be said the question was established beyond controversy that the deceased did not drink other than bay water? Let it be admitted that up to within four days from the time he was stricken with the disease, bay water was used at his working place as well as at his home.

How can it be assumed from that alone that he did not drink water elsewhere or come in contact with some other medium whereby the seeds of the disease were taken into his system? As to each of these points, if the evidence was such as to remove it from the realms of mere conjecture, certainly it was not established in plaintiff's favor so as to warrant taking it from the jury, and if not, certainly the expert could not properly pass upon the evidence in giving his opinion. All the facts on which the opinions were given, except that Green died of typhoid fever, and that prior to his taking the disease he habitually used bay water for drinking purposes, were in controversy. It seems clear that opinions going to the question of how the disease was contracted could have been properly elicited only on hypothetical questions, leaving the jury free to consider such opinions after finding from other evidence the existence of the foundation facts upon which they were based.

As a second proposition respondent suggests, with apparent confidence, that the questions were proper under the rule that a physician may testify, as to the cause of death, from personal examination or knowledge. That rule is familiar, but extends no further than the immediate cause of death, because, manifestly, that is the limit of scientific investigation. Failure to observe that test often leads to prejudicial error. A competent witness may testify as to whether a person came to his death by a wound found upon the body, but not as to who inflicted it, because, as said, he cannot go beyond the range of scientific investigation. This court said, an expert may testify that certain injuries to a female, found on personal examination, may have been caused by a ravishment, but not that they were so caused, and, we may add, certainly not who was the guilty party. *Noonan v. State*, 55 Wis. 258. These illustrations show clearly that respondent's counsel erred in relying on the rule mentioned to sustain the method of examination of the expert resorted to.

That such was their reliance is evident from the fact that they rounded out their examination by interrogating the witness as to whether he gave his opinions from personal examination. Wherever expressions are used in the books to the effect that opinion evidence of the cause of death, based on personal examination, is admissible, they will readily be seen, by a little attention to the matter, to relate solely to the immediate cause, not what set the cause in motion.

Opinion evidence was permitted against objection, as to the duty of the defendant with reference to testing the water supply. As to this, respondent's counsel answer, the objectionable parts of the evidence, if there be such, were not responsive to the questions. An examination of the record fails to bear out that view. The questions were: "What, in your judgment, should the water company do with reference to ascertaining the purity or impurity of the water?" "How frequently, in your judgment, should these analyses be made?" They seem to call very clearly for opinion evidence as to the duty of defendant as regards testing the water supply. That certainly, if material at all, was a question to be determined by the jury. No ground is perceived upon which the questions can be sustained. It was competent to show by opinion evidence that the quality of the water was only determinable by certain tests, but whether legal duty required defendant to make the tests was certainly not a matter for such evidence.

The appellant further complains of a ruling, admitting in evidence an article published in an Ashland newspaper about seven months prior to Green's death, wherein the defendant was charged with distributing poisonous water to its customers and requiring the city to pay for water service twice as much as was proper, and it was suggested that the most expeditious method of dealing with defendant, in order to remedy the evils complained of, was to annul its franchise and seize its property; and it was further suggested that the

officers of the company should be prosecuted without leniency, civilly and criminally, if they did not voluntarily and immediately remedy such evils. There can be no justification suggested for the admission of that evidence. We have a right to assume that the learned counsel for respondent were unable to suggest any, as they did not attempt to do so. If overcharges were made by the water company, that had nothing to do with causing the death of Green by typhoid fever, and if the death was so caused, the declarations made in a newspaper in regard to the condition of the water certainly had no possible bearing on that question. They were no more competent as evidence because made editorially in a newspaper than if made by any individual. They had no legitimate place in the trial. They were well calculated to prejudice the jury against the defendant and prevent a fair and impartial trial of the important issues between the parties on the legitimate evidence produced. An examination of the record shows that considerable other evidence, admitted over the objections of appellant's counsel, to which no particular reference is made in their brief, was irrelevant and prejudicial. This observation refers to proceedings of the common council covering a period of about one year before Green's death and a month or two afterwards. That placed before the jury the history of a bitter contest that existed between defendant and the city of Ashland, covering the period mentioned. It closed with a resolution passed some time after the death of Green, canceling the defendant's franchise and directing the city attorney to commence proceedings to annul the same by judicial decree and to condemn the water supply. It is not claimed that any of this evidence was admissible for any purpose except to show notice to the defendant that it was claimed by the city that the bay water was unwholesome for domestic use. So little of it was relevant for that purpose, and that little so involved with matter having no bearing even on the question of no-

Green vs. Ashland Water Co.

tice, and so tending to prejudice the minds of the jury unfavorably to the defendant and to prevent a fair trial, that the whole should have been rejected on defendant's objection.

The remaining question for consideration was raised by the motion for a nonsuit, the motion to direct a verdict, and the motion for a new trial. All the rulings may properly be considered together. The learned trial court correctly held that the franchise under which the defendant operated its works did not require it to go outside of Chequamegon Bay for a water supply. Following that and the negligence alleged in the complaint,— failure to extend the intake pipe to a point beyond the reach of sewage contamination,— the court submitted to the jury these questions: " Could the defendant company have procured wholesome water from Chequamegon Bay at and prior to the sickness of Green ? " " Was the defendant company guilty of negligence which was the proximate cause of the death of Green ? " " Did defendant know, or ought it reasonably to have known, prior to the time when the deceased contracted the disease from which he died, that the water it furnished deceased was contaminated by typhoid germs ? " To each of such questions the jury answered in the affirmative. Thus, it will be seen, the right of plaintiff to recover was made to turn on whether defendant negligently failed to extend its intake pipe into pure water in Chequamegon Bay. As heretofore indicated, the mere fact of impracticability or impossibility of obtaining a pure water supply in the bay, if such were the facts, did not legally excuse defendant from knowingly distributing dangerously impure water for domestic consumption under such circumstances that persons of ordinary intelligence might probably use the same with dangerous consequences. But as that was not the theory of the pleaders in making up the issues for trial, or in the submission of their case to the jury, the case will be considered as the parties and the trial court considered it. Whether a judgment

could be sustained under the complaint and findings of fact against defendant on the other theory, is immaterial, on account of the branch touching defendant's fault, which is to be considered hereafter.

Does the evidence warrant the finding that defendant failed to exercise ordinary care to procure a pure water supply from the bay? That, as indicated, is the key to plaintiff's case. We have searched the record from beginning to end, and read and re-read it with the greatest care, to find such evidence, and have failed. The point was raised in appellant's brief that no such evidence exists, and no reply thereto appears in the brief of respondent. No evidence is pointed out by them upon which the findings can rest. They evidently turned, if based on evidence at all, on an unsworn report of a chemist, based in part on an unverified report of an examination made by Vaughn, of the Michigan University, of several samples of water, one of which was taken from a point about 1,000 feet east of the breakwater, which point was about two miles from the pumping station. The samples were selected some time after the occurrence complained of. The one east of the breakwater was the only one found free from sewage contamination. The chemist who made the report did not place sufficient reliance thereon to recommend resorting for a supply to the place where, on the single occasion, pure water was found. He thought a supply might be found there with reasonable certainty, but expressed a preference for going outside the bay entirely. All the sworn evidence in the case shows that if pure water was found on one occasion at a particular place, that situation might or might not continue; that the bay water was so generally contaminated with sewage, especially in the spring, that a safe supply could not be found there with any reasonable certainty. Dr. Hosmer said, if there was no current, there would be more protection; that towards Washburn, just before reaching the sewage on that side of the

bay, was the safest place, but on account of the swinging currents one could not tell anything about it; that emptying so much sewage into the bay was sufficient to condemn it as a source of water supply without any test. Some tests were made of samples taken from different parts of the bay, one being near Houghton Point, several miles from the pumping station, that being the only one free from sewage contamination. One of the experts said that it was improper to take water for dietetic use from a body of water having no current, into which the sewage of a city was drained, unless the sewage delivery and the end of the intake pipe were many miles apart. There is a large amount of evidence of that character in the record, and nothing to controvert it.

Further, it is shown that nearly a year prior to the death of Green, the officers of the city and the officers of the water company were of one mind as to the necessity of going outside the bay to get water suitable for domestic use. As early as February, 1893, an official report was made to the common council and adopted, to the effect that the intake pipe should be extended so as to take the water supply from the lake instead of the bay, and the city attorney was requested to draw a resolution formally directing the defendant to make such extension. In April, thereafter, such a resolution was drafted by the board of health and adopted by the council, and thereafter an attempt was made to condemn the water supply and annul the defendant's franchise because it did not go to the lake with its intake pipe. It clearly appears all through the proceedings of the common council, for nearly a year prior to the death of Green, that all parties understood that the bay water was unsuitable for dietetic use. During all that time a contest existed between the municipality and the defendant as to whether the latter was obliged to extend the intake pipe into the lake, it being agreed that water free from dangerous pollution could not be obtained from the bay.

That being the situation as to the primary parties to the contract, the situation could not be different as to private persons who became parties thereto by claiming the benefit of the contract. The verdict of the jury on the point here considered appears to be contrary to the evidence, and if a recovery on the record depends on that question, the verdict should have been directed for the defendant, and the judgment appealed from cannot stand. There is no explanation, it would seem, of the finding of the jury, consistent with the theory that it was based on evidence, except that they considered that regarding the filtration system, and did not mean to say that the water of the bay, without treatment by filtration, could at any point be depended upon as a safe source of supply.

It is further contended by appellant's counsel that the evidence conclusively shows contributory fault of deceased, precluding a recovery. As before indicated, if deceased drank the bay water with knowledge, or reasonable means of knowledge, that it was dangerously polluted with sewage, he took upon himself the risk, and the plaintiff cannot recover, whether recovery be sought on the ground of deceit or negligence. The jury found specifically for plaintiff on that point, yet said by another finding that prior to the death of Green it was publicly and widely stated, and believed, among the citizens of Ashland, that the cause of typhoid fever epidemics in the city was the impure drinking water furnished by defendant. In view of the fact, which we deem uncontroverted by the evidence, that the water was impure, and that such condition had existed for a long time and was widely and commonly known, the findings referred to are inconsistent, there being no evidence explaining why the deceased did not know of that which was a matter of common knowledge in the community where he lived. Common knowledge of a fact raises a presumption that all persons of average intelligence have notice of it. That is elementary.

Green vs. Ashland Water Co.

Not only was there no proof to justify the jury in saying the deceased did not have reasonable ground to believe what they said was commonly known and believed, but there is much affirmative evidence to the contrary. He knew that the sewage of the city was drained into the bay, and that the defendant's water supply was taken therefrom. He was an intelligent, reading, working man. He took one of the city papers wherein the dangers of taking water from the bay were discussed. He had typhoid fever in his family six months before he was stricken, his wife being the afflicted party. She was attended by Dr. Hosmer, one of plaintiff's witnesses, who was thoroughly conversant with the condition of defendant's water supply, and who probably talked with the deceased on the subject, as he did with intelligent men generally, it being a matter of common talk. All these facts are in evidence. It is not deemed advisable to quote the evidence at length. Suffice it to say that the proof is overwhelming to the point that the bay water was dangerously polluted at the time Green was stricken with the fever, and that it had been in that condition, especially in the spring, for several years; that the facts in that regard were understood in the city generally, and had been the subject of discussion at public meetings and in the city council, and in the newspapers, and among the people for a long time. There is no evidence in the record to rebut the presumption that the deceased had notice of what was so commonly known. So we cannot escape the conclusion that the verdict of the jury on the subject of Green's contributory fault is without evidence to support it, and that the contrary is established by the evidence. For this and the other reasons mentioned the judgment appealed from must be reversed.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.