HORGEN, Respondent, vs. CHASEBURG STATE BANK, imp.,
Appellant.

*March 17—April 12, 1938.*

For the appellant there were briefs by *F. E. Steele* and *Hale & Skemp,* all of La Crosse, and oral argument by *Quincy H. Hale.*

For the respondent there was a brief by *J. E. Barnett* of Boscobel and *Harry E. Carthew* of Lancaster, and oral argument by *Mr. Carthew.*

FAIRCHILD, J.   Irrelevant and prejudicial matter was brought to the attention of the jury, (1) by plaintiff's effort to introduce clearly immaterial evidence with relation to directions by the banking commission that the bank discharge its cashier and to the matter of the use of bonds of Mrs. Lietke, a customer of the bank, as collateral to Fred Lowe's account; (2) by plaintiff's unsupported accusations that John Lowe was guilty of making false and fraudulent representations to plaintiff to induce him to lend his property to Fred Lowe; and (3) by framing of questions so as to carry imputations of irregularities on the part of the bank and its cashier.   Early in the proceedings, at a time when the conduct of counsel was first challenged, the court called attention to the only issue actually raised by the pleadings by saying:

"He alleges in his complaint that he did deposit it [his certificate], because he was told by the bank and Fred Lowe that it was necessary for him to do that as security for any checks he might issue in payment of these cattle that he agreed to buy.   .   .   .   Now, the bank and the defendant Lowe in their answer deny that and allege as the reason for this deposit with the bank of this certificate of deposit that it was given to Lowe to be deposited with the bank as collateral security to debts that he owed the bank, isn't that what they claim?"

These facts are undisputed: The plaintiff did place his certificate of deposit for $8,000 in the keeping of the Chaseburg State Bank, and the bank had insisted that Fred Lowe furnish collateral to secure his account.   The only question in issue, then, is the one framed and submitted to the jury. The trial judge, in ruling on motions after verdict, said:

"The story of the plaintiff as to how he came to turn the certificate over to the bank is hard to believe, and likewise the story of Fred Lowe as to how he came to get the plaintiff

to go to the bank and turn the certificate over to the bank is hard to believe, he having years before borrowed $24,000 or $25,000 of Mr. Horgen, which he was unable to repay, and had never paid."

But it is certain that Horgen left his certificate at the bank for one of two purposes; either the one claimed by the plaintiff or for the purpose claimed by the bank. It will be seen that a jury question existed, and this should have been passed upon by a jury free from prejudices created by intimations of acts participated in by John Lowe which could occur only if he were dishonest and willing to take advantage of customers of the bank. The evidence offered as bearing upon these points was properly rejected because so disconnected with the transaction to be investigated in this trial as to be outside the limit or scope of such investigation, and therefore immaterial.

In portions of counsel's opening statement, we find the following:

"The testimony will show that John Lowe, the cashier of this bank, knew all about this transaction [with one Gannon] and was a party to it and that the bank had notice of it, and that he signed this note with his brother was given to Mr. Gannon.

"It will show more than that, it will show that this note given to Mr. Gannon was a forged note.

"It will show that in connection with the transactions with Mr. Gannon and in connection with this matter that they had Mr. Gannon sign a statement of his property; that the bank filled it in; that John Lowe at the bottom of that official paper there in the bank certified as a notary public that Mr. Gannon signed it before him, a violation of the law of the state of Wisconsin."

"The same examination [by the bank examiners] disclosed the fact that in connection with this same Fred Lowe account the bonds of a certain woman who resided up at Chaseburg had been embezzled by somebody."

"Along after this examination of the bank in June the banking department called John Lowe and the directors of

this bank into Madison. They insisted that on account of the condition of the bank that John Lowe be removed as the cashier of that bank."

The portions of the opening statement to which exceptions were taken are vigorous in insinuation that fraud had been perpetrated upon plaintiff; that the cashier of the bank was so intimately associated with the matters as to be guilty of grossly improper conduct. The injection of the fact of the use at one time of certain bonds as collateral to the Fred Lowe account, these bonds belonging to a customer of the bank, accompanied, as it was, by the direct charge of their embezzlement made in the hearing of the jury, could not help but raise doubts as to the credibility of defendant's witnesses and influence the mind of the triers of fact against defendant in weighing the testimony. This is also the effect of an unsupported charge, in substance, that a fictitious property statement of one dealing with the bank whose credit was being used as collateral to Fred Lowe's account had been made up. It is also unfortunate that, in connection with these and other matters, there was an effort on the part of plaintiff to create the impression that a forged note had been used in an effort to stabilize the account under consideration. While this latter charge was not definite or specific in its reflection upon the cashier, still it lent its weight to a belief that dishonest and unlawful methods were being resorted to by those representing the bank. The prejudicial imputations just summarized were augmented by questions embodying something in the nature of an accusation addressed to witnesses, such as:

"You recall further, do you not, that while we were there at that conversation, and after Mr. Lowe had made his statement, I asked you whether you were familiar with the fact that Mr. Lowe, the cashier of your bank, had been kiting checks with the Lynxville bank, and then was the time when you said you refused to answer any more of my questions, isn't it?"

At the close of the plaintiff's case, there was no evidence on which to base a charge of collusion between the bank or any of its officers and Fred Lowe in his effort to induce plaintiff to lend him property for use as collateral. There was certainly no fact warranting an inference that the bank or any of its officials were endeavoring to trick plaintiff into parting with the possession of his certificate of deposit. And in the further proceedings on the trial there was nothing by way of examination or cross-examination bringing in such proof. The color of surrounding circumstances is not to be heightened by unsupported charges. Even when fraud is in issue, the effort to create inferences is to be limited to tangible facts from which reasonable inferences can arise.

With the record in this condition, the inescapable conclusion is that prejudicial error arose by reason of the objectionable questions and statements. As matters developed, the dispute would be determined as the jury believed either Cornelius Horgen or John Lowe as to what was said at the time the certificate was left at the bank. John Lowe testified in substance:

"I told Mr. Horgen my brother was drawing drafts on his commission firm and had to put up collateral security in the bank to secure them. He said he was willing to put up the certificate and took it out of his pocket. I inspected it and told him that if it was to be used as collateral, he had to indorse it; and he indorsed it and left it lying on the table. I picked it up when we left the room. We visited there a while about different things. We then went out to the workroom of the bank. I sat down at the typewriter and wrote the assignment of the collateral, both the Gannon note and the Horgen certificate. I wrote up the assignment and took it to Fred and he signed the assignment. He indorsed the Gannon note too and pushed them both back to me."

In order to overthrow that testimony, plaintiff could properly use his own story as to what occurred and could point to any inconsistencies or weaknesses in the story of John Lowe.

and would be entitled to the benefit of all the circumstances that tended to support his contention. The terms of the contract might have been misunderstood by the parties or selfish reasons may have caused one or the other to change his attitude after the contract was made. Fred Lowe may have been actuated by motives to which John Lowe was a stranger. The jury were told that they were the judges of the credibility of the witnesses and of the weight to be given the testimony, and in determining the credibility of any witness to take into consideration the apparent intelligence of the witness, his candor,—

"knowledge of the matters testified about, interest in the result of the trial, if any, relationship to or relations with the interested parties, corroboration by other credible evidence or proved facts or circumstances, the motives if any motives are apparent for falsifying, or the absence of these things or of any of them so far as their presence or absence appears from the trial, the manner and appearance of the witnesses upon the witness stand, the interest reasonableness or the absence of it in the statements made by any witness, and any other facts or circumstances appearing from the evidence upon this trial and tending to affect the issue in the case."

To impeach character by unsupported insinuation that one has been a transgressor is not permissible. The reason the cases go against an inquiry to particular facts is that life's isolated events are too uncertain in origin and motive to give direct and reliable measures of character. Each act is too apt to grow out of the immediate circumstances surrounding it to warrant taking one act as a measure of the actor's character and therefore indicative of his credibility. In the absence of evidence warranting derogatory statements involving the credibility of a witness, his good character and honesty as a party to the transaction should be free from such attacks. This does not limit the duty and right of counsel to indulge in all fair argument in favor of the right of his client, but when the bounds fixed are exceeded, error comes in, and then the only question is whether such error is

prejudicia[ ]n its effect. Here, the statements made in the presence of the jury certainly capable, if not designed, to affect the analysis by it of credibility of a witness cannot be overlooked under the circumstances present. During the trial, influenced by the fact that his client was paying another's debt and believing that the client had been drawn in as surety against his intention, the counsel did transgress in the particulars pointed out to such an extent that prejudicial error exists, and we are of the opinion that a mistrial should have been declared when the persistence of counsel had brought about the situation described.

Granting of new trials is not encouraged, and there are many cases where counsel have overstepped the bounds of propriety and new trials have not been granted. These cases are cited by plaintiff in his brief, and we have considered them. They are consistent with the rule here applied. Language in the opinions does no more than point out instances which may be recognized as not requiring the application of the rule. See *Kiekhoefer v. Hidershide,* 113 Wis. 280, 291, 89 N. W. 189.

An early discussion of the rule is found in *Brown v. Swineford,* 44 Wis. 282, 293. It was there held error sufficient to reverse a judgment for counsel against objection to state facts pertinent to the issue but not in evidence, or to assume *arguendo* such facts to be in the case when they were not, and also to impute facts not pertinent to the issue, but calculated to prejudice the case. The rule was considered and applied in *Green v. Ashland Water Co.* 101 Wis. 258, 77 N. W. 722; *Corti v. Cooney,* 191 Wis. 464, 211 N. W. 274. In the *Brown Case* Mr. Chief Justice RYAN said:

"The profession of the law is instituted for the administration of justice. The duties of the bench and bar differ in kind, not in purpose. The duty of both alike is to establish the truth and to apply the law to it. It is essential to the proper administration of justice, frail and uncertain at the best, that all that can be said for each party, in the determi-

nation of fact and law, should be heard. Forensic strife is but a method, and a mighty one, to ascertain the truth and the law governing the truth. . . . The very fullest freedom of speech within the duty of his profession should be accorded to counsel; but it is license, not freedom of speech, to travel out of the record, basing his argument on facts not appearing, and appealing to prejudices irrelevant to the case and outside of the proof. It may sometimes be a very difficult and delicate duty to confine counsel to a legitimate course of argument. But, like other difficult and delicate duties, it must be performed by those upon whom the law imposes it. It is the duty of the circuit courts, in jury trials, to interfere in all proper cases of their own motion. This is due to truth and justice. And if counsel persevere in arguing upon pertinent facts not before the jury, or appealing to prejudices foreign to the case in evidence, exception may be taken by the other side, which may be good ground for a new trial, or for a reversal in this court."

In certain cases such as *Lehner v. Chicago, M., St. P. & P. R. Co.* 204 Wis. 558, 236 N. W. 572, where the appeal to prejudice was in the nature of eloquent exaggeration of the evidence, the remarks were not considered prejudicial to a degree requiring a reversal; the verdict on the main issue being amply supported by the evidence. In such cases as *Neumeister v. Goddard,* 133 Wis. 405, 113 N. W. 733, where this court felt that more vigorous action on the part of the trial court should have occurred, we deferred to the judgment of the trial judge in holding the error not prejudicial, but in the case now before us, the probabilities of either side being right are so nearly equal that the unwarranted insinuations of counsel resulted in a prejudice against defendant which may have affected the outcome. We think that it was an abuse of discretion on the part of the trial judge not to grant a new trial.

*By the Court.*—Judgment reversed, and cause remanded with directions to grant defendant bank a new trial.