# COURT OF APPEALS
# DECISION
# DATED AND FILED

## September 3, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2266-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF125

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

EZRA J. MCCANDLESS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dunn County: JAMES M. PETERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Following a 15-day trial, a jury found Ezra J. McCandless guilty of first-degree intentional homicide for killing Alexander

Woodworth. McCandless now appeals from her judgment of conviction and from an order denying her postconviction motion.[1] On appeal, McCandless raises numerous legal issues that she claims entitle her to a new trial. For the reasons that follow, we reject each of her claims and affirm.

## BACKGROUND

¶2 On March 22, 2018, McCandless arrived on foot at a stranger's home in Dunn County. According to the criminal complaint, she "was bleeding[,] her clothes were torn," and she was "covered in mud." McCandless told the owner of the home that she had been "attacked." She was subsequently taken to the hospital, where she was treated by Dr. Robert Tillotson and underwent a sexual assault examination, completed by a sexual assault nurse examiner (SANE). Using a SANE kit, the examiner documented abrasions or lacerations to various areas of McCandless's body. The lacerations on McCandless's left arm appeared to be letters cut into her skin, spelling out the word "B-O-Y." McCandless stated that she could not remember what happened to her or if she was sexually assaulted.[2]

---

[1] McCandless uses they/them pronouns. However, at trial and within her briefing before this court, she used she/her pronouns "to avoid confusion." We will follow McCandless's lead.

[2] McCandless also initially told law enforcement that her name was Monica Karlen, which was later determined to be her birth name.

¶3      Tillotson, believing that McCandless's wounds were self-inflicted, referred her for a mental health evaluation. McCandless was then admitted to a secure psychiatric unit pursuant to WIS. STAT. § 51.15(1)(ag) (2023-24).[3]

¶4      While in the psychiatric unit, McCandless was questioned by detectives with the City of Eau Claire Police Department and the Dunn County Sheriff's Office. During an interview on March 23, 2018 (the March 23 interview), she reported to the detective that she went to Owen Park in Eau Claire with Woodworth but that she did not remember anything else, including where to locate her car or where detectives could find Woodworth.

¶5      According to the trial testimony, in the evening on March 23, law enforcement followed footprints in the mud from the home where McCandless had sought help, and they found her car as well as Woodworth's body, which was positioned halfway outside of a rear door of the vehicle. Woodworth had been stabbed 16 times. Later, law enforcement found a knife as well as Woodworth's phone in a ditch along the road leading to the home.

¶6      The next day, March 24, 2018, McCandless was questioned again (the March 24 interview). During that interview, conducted by two detectives, McCandless first denied remembering anything beyond going for a drive with Woodworth to talk. When the detectives eventually informed McCandless that they had found Woodworth, she then told them what happened, expressing that it was "really painful." She stated that Woodworth grabbed her by the throat, pinned

---

[3] The offense at issue in this case took place in March 2018. However, McCandless does not allege that the relevant statutes have changed since that time. Accordingly, for convenience, all references to the Wisconsin Statutes are to the 2023-24 version.

her down in the backseat of the car, and cut her with a knife. To defend herself, McCandless said she grabbed the blade of the knife, gained control of it, and stabbed Woodworth repeatedly. According to McCandless, the struggle occurred both inside and outside of the car. She also admitted that she, not Woodworth, had carved "boy" into her left forearm.

¶7     The State charged McCandless by information with first-degree intentional homicide by use of a dangerous weapon. Prior to trial, McCandless moved to suppress her statements during the March 23 and 24 interviews on both *Miranda v. Arizona*, 384 U.S. 436 (1966), and *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965), grounds.[4]     The circuit court denied McCandless's motion by oral ruling. The case then proceeded to a 15-day jury trial, where McCandless alleged that she had acted in self-defense.

¶8     At trial, McCandless testified in more detail about her relationship with Woodworth, explaining that they had been in a sexual relationship. During her testimony, McCandless addressed some of Woodworth's journal entries that he had shown to her or discussed with her, which were thereafter entered into evidence. These journal entries and their conversations involved topics such as "internal pain and loneliness," self-sacrifice, violence, Woodworth as "an individual [that] comes back from the dead," and cannibalism, specifically

---

[4] McCandless's motion to suppress challenged both law enforcement's failure to provide her with the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and the voluntariness of her statements. *See State v. Jiles*, 2003 WI 66, ¶¶25-26, 262 Wis. 2d 457, 663 N.W.2d 798 (explaining the difference between a *Miranda* challenge and a *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965), challenge).

McCandless later withdrew her motion to suppress statements made during the March 23 interview based on her concession that the interview was not a custodial interrogation.

"consum[ing an] individual so that th[e] person they had loved would never leave them." She also alleged that Woodworth had previously committed self-harm. According to McCandless's testimony, their relationship changed over time, and she became uncomfortable with some of Woodworth's sexual requests. McCandless stated that their relationship ended in late February 2018.

¶9 McCandless testified that she went to Eau Claire on March 22, 2018, to handle some errands, return belongings to Woodworth, and talk to him about their relationship. At one point, they decided to drive somewhere to talk. Eventually, the car got stuck in the mud, and they were unable to dislodge it. McCandless began suffering from severe anxiety, and Woodworth suggested that she lie down in the back seat of the car, which she did. McCandless alleged that Woodworth got on top of her and began describing her in the third person, calling her boy, saying "how he deserves this," and that she "had betrayed him." He then covered her eyes, and he began cutting her clothes and skin with a knife. McCandless testified that she was frozen, and she was "afraid [he was] going to kill [her]." A struggle eventually ensued, during which Woodworth "grab[bed McCandless] by the throat" and "kept ripping [her] hair out from [her] head." McCandless was able to disarm Woodworth, and she "began to defend" herself by stabbing him.

¶10 McCandless testified that after the struggle, she felt "dizzy and faint," like she could not catch her breath, and she said that "things [were] starting to go black at the sides." She "decided that [she] needed to go and [she] needed to get out of there" because she was "panicking." It was at this point that she "scratched the word 'boy' into [her] arm" as a "reaction." She speculated that it was done to "w[a]ke [herself] up in a sense" and help her "feel," but she testified that she "really just d[id not] know the answer" to why she cut herself. She then

took the knife and Woodworth's phone and walked away from the scene. McCandless remembered "stumbling down a road," and she fell a few times, which caused her to drop the knife and the phone.

¶11    Several experts, for both the State and the defense, also testified at the trial. They discussed McCandless's injuries, specifically whether the injuries were self-inflicted or inflicted by another person, that she had bruises on her neck consistent with having been strangled, that the injuries on her hands and forearms were consistent with defensive wounds, and that the location of McCandless's injuries could have been fatal had the cuts been deeper. There was also testimony presented about Woodworth's injuries. The forensic evidence that was collected from the scene included both McCandless's and Woodworth's blood in various locations in and around the car. Both McCandless's and Woodworth's DNA were also found on the knife, and "a wad of [McCandless's] hair" was found on the floor in the back seat area of the car.

¶12    McCandless presented testimony from two experts regarding the psychological effects of trauma on fear responses and memory: Dr. James Hopper, a behavioral researcher and clinical instructor of psychology and psychiatry at Harvard Medical School, and psychologist Steven Benson, who evaluated McCandless. Hopper reviewed police reports, medical records, recordings, and transcripts from this case, and he gave his opinion regarding the problematic techniques used during McCandless's interviews. Benson testified that he diagnosed McCandless with post-traumatic stress disorder (PTSD), childhood onset, and persistent depressive disorder with anxious distress. He further explained that McCandless's statements during her interviews with law enforcement were consistent with those diagnoses, including intrusive thoughts and avoidant symptoms, disassociation, and regression, which explained why she

6

gave emergency responders her birth name. Benson also testified that self-cutting can be a trauma response.

¶13 After the close of evidence, and as relevant to this appeal, the circuit court provided jury instructions, which included pattern jury instructions for first-degree intentional homicide; lesser included offenses; perfect self-defense; and imperfect self-defense. The court also provided two nonpattern jury instructions, limiting the bases for the jury's consideration of both Woodworth's journal entries and the evidence regarding McCandless's "mental condition."

¶14 The jury convicted McCandless of the charged offense. The circuit court subsequently sentenced her to life in prison, with the right to petition for extended supervision after 50 years.

¶15 McCandless thereafter filed a postconviction motion, seeking to vacate her judgment of conviction and requesting a new trial. Her motion included multiple assertions of ineffective assistance of counsel.[5] She further alleged that the circuit court improperly limited Woodworth's journal entries and that the State made improper closing arguments. The circuit court held a *Machner*[6] hearing, at which defense counsel testified.[7] The circuit court denied

---

[5] As the State explained, "McCandless was represented by two attorneys at trial," but the State decided to refer to a singular defense counsel in its appellate brief "for the sake of clarity." We will do so as well.

McCandless raised some ineffective assistance of counsel claims in her postconviction motion that she does not renew on appeal. McCandless also alleged two ineffective assistance of counsel claims pertaining to her motion to suppress.

[6] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[7] McCandless explains, however, that that circuit "court did not permit Ms. McCandless to question counsel about the decisions pertaining to the suppression claims, after concluding that it would have denied the suppression motions regardless of how counsel litigated the claims."

McCandless's postconviction motion by oral ruling, which it later memorialized by written order. McCandless appeals.

## DISCUSSION

### I. *Miranda* claims

¶16 McCandless's first argument is that the statements that law enforcement obtained from her during the March 23 and 24 interviews, while she was detained on a locked psychiatric unit, violated her *Miranda* rights and must be suppressed. Her arguments take two forms. First, she argues that defense counsel was ineffective for withdrawing the motion to suppress the statements she made during the March 23 interview. Second, she argues that the circuit court erred by denying her motion to suppress the statements she made during the March 24 interview.

¶17 We review the circuit court's decision on a motion to suppress evidence under a mixed standard of review, upholding any findings of fact unless clearly erroneous but independently considering whether those facts demonstrate a constitutional violation. *State v. Young*, 2006 WI 98, ¶17, 294 Wis. 2d 1, 717 N.W.2d 729.

¶18 To secure a person's Fifth Amendment privilege against compelled self-incrimination, a suspect in a criminal investigation "must be warned that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 467-69. These so-called *Miranda* warnings are a necessary prerequisite before the

State may introduce at trial any statements by a suspect stemming from a "custodial interrogation." *Id.* at 444.

¶19 Determining whether a person is in custody is a two-step analysis. *State v. Halverson*, 2021 WI 7, ¶17, 395 Wis. 2d 385, 953 N.W.2d 847. "First, courts 'ascertain whether, in light of the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* (alteration in original; citation omitted). To do so, we consider "the totality of the circumstances, including relevant factors such as 'the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.'" *Id.* (citation omitted). "The inability to leave and terminate the conversation, however, is not enough on its own to trigger the need for *Miranda* warnings"; "[t]he freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Halverson*, 395 Wis. 2d 385, ¶17 (citation omitted). The second step then asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Halverson*, 395 Wis. 2d 385, ¶17 (citation omitted).

¶20 An ineffective assistance of counsel claim requires a defendant to demonstrate both that his or her counsel's performance was deficient and that the deficient performance was prejudicial. *State v. Balliette*, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. Deficient performance is demonstrated when counsel's representation falls below an objective standard of reasonableness considering all the circumstances. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). We presume that counsel's conduct "falls within the wide range of reasonable professional assistance," *id.* at 689, and counsel's decisions regarding

trial strategy are given great deference, ***Balliette***, 336 Wis. 2d 358, ¶26. Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," meaning "a probability sufficient to undermine confidence in the outcome." ***Strickland***, 466 U.S. at 694. The defendant "need not prove the outcome would 'more likely than not' be different in order to establish prejudice." ***State v. Sholar***, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted).

¶21 An ineffective assistance of counsel claim also presents a mixed question of fact and law. *See* ***State v. Alexander***, 2015 WI 6, ¶15, 360 Wis. 2d 292, 858 N.W.2d 662. The circuit court's findings of fact will be upheld unless they are clearly erroneous, ***State v. Gutierrez***, 2020 WI 52, ¶19, 391 Wis. 2d 799, 943 N.W.2d 870, but whether counsel's performance was deficient and whether that deficient performance prejudiced the defendant are questions of law that we review independently, ***Alexander***, 360 Wis. 2d 292, ¶15.

*A. The March 23 interview*

¶22 According to McCandless, her defense counsel provided constitutionally ineffective assistance by withdrawing her motion to suppress the statements she made during the March 23 interview because that interview was a custodial interrogation and because law enforcement failed to provide ***Miranda*** warnings.[8] She identifies several factors that she argues weigh in favor of her

_____

[8] As noted above, McCandless withdrew her motion to suppress statements made during the March 23 interview and conceded below that the interview was not a custodial interrogation; thus, she has forfeited her arguments related to that interview. For the purpose of her ineffective assistance of counsel claim, we address her arguments regarding the March 23 interview to determine whether the underlying ***Miranda*** claim would have been meritless.

being in custody: at the time of questioning, McCandless was involuntarily detained in a locked psychiatric unit; the questioning itself took place in a locked conference room, which was inaccessible to patients; law enforcement never told her that she was free to decline questioning and leave; her back was to the door in the conference room; the detective who was with her "was not in full uniform, but he wore a police badge, handcuffs, and sidearm, all of which were visible"; McCandless was in hospital scrubs; the detective was a significantly larger individual than McCandless; the questioning lasted about 30 minutes, which was significant given "McCandless'[s] vulnerable position"; and she was not free to leave after questioning because she was on a 72-hour mental health hold.

¶23    We conclude that McCandless was not in custody for the March 23 interview because a reasonable person in McCandless's position would have felt free to terminate the interrogation and leave the room. In this case, McCandless had not been arrested, she had not been taken to a police station or questioned in a police vehicle, she was not restrained, she was not threatened, and the detective never removed his handcuffs or gun from his waist. *See State v. Bartelt*, 2018 WI 16, ¶32, 379 Wis. 2d 588, 906 N.W.2d 684.

¶24    The interview occurred because the detective "ask[ed] if [McCandless] want[ed] to meet with [him]," and he "was advised that she would meet with [him]." At one point during the interview, the detective informed McCandless that "[y]ou're not in trouble," and she responded, "I wouldn't think I would be in trouble." *See id.*, ¶38. The circuit court specifically found that the March 23 interview occurred because "there was obviously some concern for [McCandless's] wellbeing," "[i]t was all calm conversational tone," and the detective "treated [her] as if she [were] a victim and was trying to find out what happened." These findings were not clearly erroneous.

¶25     In further support of these findings, the record reflects that at the time of the March 23 interview, McCandless was in a medical facility where she had a private room. The interview occurred within a conference room in that facility, and based on the conversation McCandless overheard between the detective and a woman at the facility, McCandless knew that the door to the conference room was unlocked from the inside and that she could leave and return to her room on her own. Therefore, while she could not leave the larger facility, she could retreat to her private room. Further, we disagree with McCandless that her positioning in the room was indicative of custody. Rather, the fact that her chair was nearest to the door meant that she had the shortest path to exit the room, and she was not required to pass the detective in order to reach it. Finally, the conversation lasted for about 30 minutes, which is a "relatively short" amount of time, even considering the other factual circumstances. *See id.* (citation omitted). Thus, McCandless was not in custody.

¶26     In arguing to the contrary, McCandless focuses primarily on the fact that she was in a locked facility, that she was not there voluntarily, that she was in a "particularly vulnerable condition," and that the "police were responsible for curtailing [her] freedom." However, the fact that she was in a locked facility is only one factor in the analysis and is not alone indicative of custody. *See Howes v. Fields*, 565 U.S. 499, 508 (2012); *Halverson*, 395 Wis. 2d 385, ¶28. We agree with the State's musing that "[i]f incarceration does not categorically render a person in custody for the purpose of *Miranda*, then a temporary detention to treat a mental health crisis does not do so either." We are not otherwise persuaded by the cases McCandless cites from this and other jurisdictions. *See State v. Muckerheide*, 2007 WI 5, ¶7, 298 Wis. 2d 553, 725 N.W.2d 930 (explaining that Wisconsin courts may consider case law from other jurisdictions but are not

12

required to follow it). For these reasons, McCandless was not in custody during the March 23 interview.[9]

¶27 At the *Machner* hearing, the circuit court prevented McCandless from questioning defense counsel about her ineffective assistance of counsel challenge based on the March 23 interview. Therefore, McCandless also appears to argue that the circuit court erred by failing to provide her the opportunity for a hearing.

¶28 We review the circuit court's decision to deny a hearing under a mixed standard of review. *See State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. Whether the defendant's motion "alleges sufficient material facts that, if true, would entitle the defendant to relief" is a question of law that we review de novo. *Id.* If the motion raises such facts, the court must hold an evidentiary hearing. *Id.* If the motion does not raise such facts, "or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *Id.* We review a court's decision to grant or deny a hearing for an erroneous exercise of discretion. *Id.*

¶29 Given that we have determined above that McCandless was not in custody during the March 23 interview, any suppression motion based on a claimed *Miranda* violation would not have been meritorious, and defense counsel cannot be found to have performed deficiently by failing to make meritless

---

[9] The State also argues that the March 23 interview was not an interrogation, but we need not reach that issue. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds.").

arguments. *See State v. Wheat*, 2002 WI App 153, ¶14, 256 Wis. 2d 270, 647 N.W.2d 441. Because McCandless fails to demonstrate that her defense counsel performed deficiently in the way she alleges, we need not address the prejudice element. *See State v. Mayo*, 2007 WI 78, ¶61, 301 Wis. 2d 642, 734 N.W.2d 115. The circuit court properly denied a hearing on this claim.

### B. The March 24 interview

¶30 McCandless also argues that the March 24 interview was a custodial interrogation and that law enforcement failed to provide her with *Miranda* warnings. The State conceded, and the circuit court agreed, that the March 24 interview was an interrogation. Thus, the remaining question is whether McCandless was in custody.

¶31 In support of her argument that she was in custody, McCandless notes that this was the third day in a row that she was questioned by police; that Woodworth's body had been found by this time, and she had become a suspect; that the day before, the detective "made a show of authority by presenting [her] with a release of medical information form, without asking her permission or telling her that she could choose not to sign it"; that she was asleep and had to be awoken for the interview; that she "was 'escorted' to the conference room by a social worker"; that the detectives were standing outside the unit and would have been visible to her; that the interview "took place in the same locked conference room as the day before, but this time, there were two armed officers instead of one"; that both officers had visible weapons and handcuffs; that the door to the conference room was closed; that her back was to the door and one detective sat across from her and one was next to her; that the interrogation lasted approximately 90 minutes; that "[s]he was teary and emotional"; that "the

circumstances showed that law enforcement were not going to leave [her] alone"; and that the detectives "ramped up the pressure to talk" and used "[p]sychological pressures." Thus, McCandless states that the detectives were required to provide *Miranda* warnings, that their failure to do so violated her Fifth Amendment right against self-incrimination, and that her statements must be suppressed.

¶32 We conclude that several factors demonstrate that McCandless was not in custody during the March 24 interview. First, and importantly, McCandless was informed by multiple sources, both prior to and during the interview, that she did not need to speak with the detectives and that she could end the interview. *See State v. Quigley*, 2016 WI App 53, ¶¶40-41, 370 Wis. 2d 702, 883 N.W.2d 139 (explaining that "advisements" that the subject is free to leave are "highly probative" to the custody determination (citation omitted)). The social worker who went to retrieve McCandless from her room testified that she "explained to [McCandless] that an officer was present in the building and wanted to speak with her" and "that she had the right to refuse." The social worker stated that McCandless "agreed to come with [her]." Once in the conference room, the detective had the following discussion with McCandless:

> Well, thank you for meeting with us again, or with me. [McCandless], this is [another detective]. He's from Dunn County. All right. So, again, thank you. They shut the door for privacy. Just like every time we talk, if you want to be done talking, just let us know. I know you're here at the inpatient behavioral health. You're in a locked facility … for safety … to get you the help that we both think you need. But that door, it's not locked. We'll end it. We'll walk you out. We'll get you to staff then get you back to where you need to go. Okay?

Based on these discussions, the circuit court reasonably found that McCandless had agreed to speak with the detectives.

15

¶33 Second, and also importantly, McCandless did eventually choose to end the interview. Toward the end of the interview, detectives asked if they could photograph McCandless's injuries, and she consented. After the photos were taken, the detective asked McCandless to answer a few more questions, but McCandless refused. Thus, as the circuit court found, McCandless "certainly had the will and the ability to say no."

¶34 Finally, many of the same circumstances from the March 23 interview were also present during this interview. For example, McCandless remained in the psychiatric unit where she had a private room to which she could retreat; the interview occurred in the same conference room, and McCandless was again positioned near the door; the detectives never brandished a weapon or put her in handcuffs; she was not told she was under arrest; and although McCandless was interrogated, the detectives never threatened McCandless or made her any promises. Thus, in light of all the above facts, we conclude that the circuit court properly determined that the March 24 interrogation was not custodial.

¶35 McCandless's arguments on appeal focus on whether the totality of the circumstances created an inherently coercive environment based on, for example, her psychiatric hold, her mental state at the time, the tenor of the detectives' questions, and the fact that they suspected her of wrongdoing because they had discovered Woodworth's body by this time. While we acknowledge those circumstances, we disagree that they overbore the facts that she was informed that she could decline to participate in the interview, that she was told she was free to leave at any time, and that she clearly understood those two pronouncements because she did eventually refuse further questioning. Further, the fact that the detectives suspected her of criminal conduct at the time of the March 24 interview does not by itself establish **_Miranda_** custody. _See **State v.**_

16

*Lonkoski*, 2013 WI 30, ¶34, 346 Wis. 2d 523, 828 N.W.2d 552 ("[A] suspect's belief that he or she is the main focus of an investigation is not determinative of custody."). For these reasons, the circuit court correctly denied McCandless's motion to suppress the statements she made during the March 24 interview.

## II. *Goodchild* claims

¶36 McCandless also moved to suppress her March 23 and 24 interview statements because she contends they were involuntary. As McCandless did with her *Miranda* claims, she asserts that defense counsel was constitutionally ineffective for withdrawing the March 23 interview claim and that the circuit court erred by denying her March 24 interview claim.

¶37 "The Fourteenth Amendment of the Constitution and [a]rticle I, [s]ection 8 of the Wisconsin Constitution require a statement to be voluntary in order to be admitted into evidence." *State v. Vice*, 2021 WI 63, ¶28, 397 Wis. 2d 682, 961 N.W.2d 1. "It is the State's burden to prove by a preponderance of the evidence that a suspect's statements are voluntary." *Id.*, ¶29. "The question of voluntariness involves the application of constitutional principles to historical facts." *State v. Hoppe*, 2003 WI 43, ¶34, 261 Wis. 2d 294, 661 N.W.2d 407. "We give deference to the circuit court's findings regarding the factual circumstances," but we review the application of the constitutional principles to those facts independently. *Id.*

¶38 "A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by … the State exceeded the defendant's ability to resist." *Vice*, 397 Wis. 2d 682, ¶29 (citation omitted). Thus, we must "examine[] whether

a defendant's will was overborne by the circumstances surrounding the giving of a confession," which "involves balancing the suspect's personal characteristics, such as age, intelligence, physical and emotional condition, and prior experience with law enforcement, against any pressures imposed upon him [or her] by police." *Id.*, ¶30. These pressures include

> the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Hoppe*, 261 Wis. 2d 294, ¶39.

¶39    "The balancing of the personal characteristics against the police pressures reflects a recognition that the amount of police pressure that is constitutional is not the same for each defendant." *Id.*, ¶40. Importantly, "[c]oercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." *Id.*, ¶37; *State v. Dobbs*, 2020 WI 64, ¶72, 392 Wis. 2d 505, 945 N.W.2d 609 ("We cannot properly label a statement involuntary unless there is 'some affirmative evidence of improper police practices deliberately used to procure a confession.'" (citation omitted)). "[E]stablishing coercion is a high bar for a defendant to surmount." *Vice*, 397 Wis. 2d 682, ¶32. "If our analysis of the facts does not reveal coercion or improper police pressures, there is no need for us to engage in the balancing test between the suspect's personal characteristics and those nonexistent pressures." *Id.*, ¶31.

*A. The March 23 interview*

¶40    McCandless renews her ineffective assistance of counsel claim based on defense counsel's withdrawal of the challenge to the voluntariness of her

statements at the March 23 interview. According to McCandless, she was "'uncommonly susceptible to police pressures' at the time of the interrogation." *See Hoppe*, 261 Wis. 2d 294, ¶60. She explains that she "was only twenty years old"; she was injured; she was "in the midst of a mental health crisis" and had been involuntarily committed into a "locked … psychiatric ward"; and she informed detectives that "things were 'fuzzy'" and that her "providers were trying to figure out what medications she should be on and what was wrong with her." "[D]espite having knowledge of her deteriorated mental state," McCandless contends that the detectives used "[s]everal tactics … to pressure" her, including "failing to give *Miranda* warnings; employing accusatory questioning; and failing to consult with medical providers regarding her mental condition and capacity to be interviewed." Thus, she claims that under the totality of the circumstances, her March 23 interview statements were involuntary.

¶41 We disagree with McCandless's unsupported assertions and conclude that her statements on March 23 were voluntary because law enforcement did not engage in any coercive or improper practices.[10] McCandless fails to provide any evidence of improper police conduct or coercion; instead, she points almost entirely to her personal characteristics. *See Dobbs*, 392 Wis. 2d 505, ¶¶73-74.

¶42 As to the arguments that McCandless does identify concerning the March 23 interview, we first note that the detective did not provide *Miranda* warnings because, as we determined above, he was not conducting a custodial

---

[10] Again, we address the merits of McCandless's *Goodchild* claim during the March 23 interview for purposes of her ineffective assistance of counsel claim.

interrogation of McCandless. *Miranda* warnings were therefore not required. We acknowledge that "[e]ven when [*Miranda*] warnings are not required, the failure to give *Miranda* warnings is relevant to our coercion inquiry." *See State v. Kruckenberg*, 2024 WI App 45, ¶51, 413 Wis. 2d 226, 11 N.W.3d 131. As we discussed above, however, the interview occurred because the detective requested to meet with McCandless, she consented to the meeting, and McCandless knew that the door was unlocked and that she could return to her room. Accordingly, there was no suggestion that McCandless was being forced to speak with the detective or that the detective would not honor her right to leave the room. *See id.* Further, while *Miranda* warnings may be relevant to the totality of the circumstances inquiry in general, the failure to give *Miranda* warnings where the warnings are not required is not in and of itself coercive or improper.

¶43 As to McCandless's allegation that the detective employed "accusatory questioning," she fails to identify which of the detective's questions fall under that umbrella. *See Kruckenberg*, 413 Wis. 2d 226, ¶¶53-54; *see also Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments."). Regardless, the record is clear that at the time of the March 23 interview, law enforcement had not yet found Woodworth's body, and the detective was operating the interview as if McCandless were a victim who had been injured and had been subject to a sexual assault examination. We therefore disagree that any allegedly accusatory questions could rise to the level of improper psychological pressure or coercive practices under these circumstances. As to the detective's failure to consult with medical providers before the interview, McCandless does not cite any legal authority in support of her claim that such a failure amounts to an improper practice or coercive tactic.

¶44    In conclusion, McCandless's failure to establish any improper police practices is determinative, and therefore her statements during the March 23 interview were voluntary.[11]    Given that we have determined that McCandless's statements on March 23 were not involuntary, a suppression motion would not have been meritorious, and defense counsel was not ineffective.  *See* ***Wheat***, 256 Wis. 2d 270, ¶14.

### B. The March 24 interview

¶45    McCandless next asserts that the circumstances at the March 24 interview "were even more coercive" and that she remained in a vulnerable state, such that her statements were not voluntary.  She identifies several tactics that the detectives employed to pressure her, "including [again] failing to give ***Miranda*** warnings;  employing  accusatory  questioning  despite  Ms.  McCandless'[s]

---

[11] In her reply, McCandless faults the State for "fail[ing] to address any of Ms. McCandless'[s] personal characteristics" and challenges "the State's misguided view that the [circuit court] should not consider her characteristics until it first determines whether the police conduct, in isolation, was coercive."  She argues that "[w]hether tactics are coercive is not a determination that can be made in isolation from a person's characteristics" because "pressures that are not coercive in one set of circumstances may be coercive in another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures."  *See* ***State v. Hoppe***, 2003 WI 43, ¶¶46, 59, 261 Wis. 2d 294, 661 N.W.2d 407; *see also* ***State v. Kruckenberg***, 2024 WI App 45, ¶63, 413 Wis. 2d 226, 11 N.W.3d 131.

While we agree that an individual's personal characteristics cannot be entirely divested from a determination of whether law enforcement has created a coercive environment, our supreme court explained in ***Vice*** that "[b]efore we balance personal characteristics against police pressures, we must *first* examine the threshold matter of coercion.  'The presence or absence of actual coercion or improper police practices is the focus of the inquiry because it is determinative' on the issue of voluntariness."  *See* ***State v. Vice***, 2021 WI 63, ¶31, 397 Wis. 2d 682, 961 N.W.2d 1 (emphasis added; citation omitted).  "If our analysis of the facts does not reveal coercion or improper police pressures, there is no need for us to engage in the balancing test between the suspect's personal characteristics and those nonexistent pressures."  ***Id.***  Even given the totality of the circumstances here, we conclude that McCandless has not identified coercive conduct or improper police pressures that occurred during the March 23 interview.

diminished mental state; failing to consult with medical providers regarding her mental condition and capacity to be interviewed; and misleading her into believing that they had not found Mr. Woodworth and did not know what happened to him." She explains,

> [t]his time, Ms. McCandless was outnumbered by armed police officers. She was seated with her back to the door, with one officer next to her and the other across from her. Both officers were questioning her. The interrogation lasted three times as long, at an hour and a half. The questioning was leading, accusatory, aggressive, and guilt-presumptive. According to Dr. Hopper, [one detective's] questioning was a "huge shift" from best practice, including "problematic" techniques like leading questions, interrupting, pressuring time-sequenced information, and having Ms. McCandless guess when she did not remember something.

Further, she explains, the detective asserted that he was there to "help" McCandless, which was misleading and amounted to an improper promise of leniency.

¶46 Based on our review of the entirety of the March 24 interview transcript, and after examining the totality of the circumstances in this case, *see Hoppe*, 261 Wis. 2d 294, ¶¶38-39, we conclude that McCandless's statements on March 24 were also voluntary. First, there is nothing inherently improper or coercive about McCandless being questioned by two detectives rather than one, and her allegedly vulnerable state does not, by itself, make their joint presence improper or coercive. McCandless does not provide legal authority to the contrary.

¶47 Second, as to the "problematic questioning," McCandless again fails to identify any specific improper questions posed by the detectives. Instead, she states generally that "[t]he questioning was leading, accusatory, aggressive, and guilt presumptive." Based on our review of the interview, which appeared cordial

22

and generally conversational, we conclude that the detectives' questions failed to rise to the level of improper coercion.

¶48    Third, although McCandless asserts that the length of the 90-minute interrogation was inherently coercive, we agree with the circuit court's conclusion that it was "not a lengthy interview."  *See Quigley*, 370 Wis. 2d 702, ¶38 ("The interview was not lengthy, lasting less than ninety minutes."); *United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) (calling a 90-minute interview a "relatively short duration").  Thus, under the totality of the circumstances, we conclude that the 90-minute conversation was not long enough to undermine voluntariness.

¶49    Fourth, as the circuit court recognized, one of the moments in the interview that "came close" to being improper or coercive was one detective's statement to McCandless that if they were going to help her, they needed the truth. During the interrogation, the detective said, "Okay.  You know, people make mistakes, [McCandless].  You know, the best way for us to help you is try to figure out what happened … in that car."  We disagree with McCandless's assertion that this was an improper offer of leniency and that she was "cornered … into a situation where she would need to admit guilt in order to get 'help' from law enforcement" because the detective did not promise anything. The general, ambiguous, singular suggestion that law enforcement could "help" McCandless if she told the truth does not rise to the level of coercive conduct.  *See State v. Berggren*, 2009 WI App 82, ¶31, 320 Wis. 2d 209, 769 N.W.2d 110 ("An officer telling a defendant that his [or her] cooperation would be to his [or her]

23

benefit is not coercive conduct, at least so long as leniency is not promised." (citation omitted)).[12]

¶50     Fifth, and finally, the circuit court also observed that the detectives initially withheld that they had already discovered Woodworth's body when they began questioning McCandless. They waited and confronted her with the discovery later in the interview. We agree with the circuit court's conclusion that the fact that the detectives withheld information about Woodworth did not amount to coercion. "[I]t is settled law that police may engage in active deception, including lying to a suspect, without rendering that suspect's statement involuntary." *Vice*, 397 Wis. 2d 682, ¶45. Here, the detective's conduct did not even rise to the level of "active deception"; instead, they simply delayed confronting McCandless with the information and allowed her to tell her version of what happened.

¶51     In summary, we agree with the circuit court that McCandless's statements during the March 24 interview were the voluntary product of her free and unconstrained will. McCandless focuses her arguments on a theory of involuntariness based almost entirely on her personal characteristics. However, it

---

[12] McCandless asserts, however, that "[t]he statements in Ms. McCandless'[s] case were not a neutral prediction of how cooperation would influence the prosecutor but rather, a misleading offer of allyship." *See Kruckenberg*, 413 Wis. 2d 226, ¶56. We disagree with McCandless's characterization of the detective's statement in this case. He did not specifically offer to help her or state that he would help her; he simply stated that "the best way for us to help you" would be to figure out what had happened, and he used the word "help" only once.

Further, the circumstances in this case are very different from the circumstances in *Kruckenberg*, where the individual was 16 years old; one of the interviews lasted for 4 hours; the comments law enforcement made to the individual were not the same or even similar to those made in this case, as law enforcement specifically told the individual, "I know you're scared. I know and *I'm going to help you*"; and law enforcement repeated the offer to help multiple times. *See id.*, ¶¶1, 17-22, 54-60 (emphasis added).

is well established that a suspect's mental state alone cannot render a confession involuntary; government coercion must also be a factor. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986). Under the totality of the circumstances, including the detective's statement that McCandless was under no obligation to talk to them, the fact that there is no allegation that McCandless is of below average intelligence, that she was an adult at the time of the interview, and that McCandless chose to end the interview, McCandless's statements were voluntary. The circuit court properly denied McCandless's motion to suppress.

### C. Ineffective assistance of counsel for failure to present further evidence

¶52 McCandless also contends that her defense counsel was ineffective for failing to submit additional evidence to support her suppression motion based on voluntariness. According to McCandless, defense counsel should have waited to receive the evaluations from Benson and Dr. Gregory Van Rybroek, whom the circuit court had appointed to complete an evaluation, before filing the motion to suppress because the information contained in their evaluations provided additional support. Here, too, the circuit court did not allow questioning on this issue at the *Machner* hearing and, therefore, denied McCandless a hearing on this issue.

¶53 We agree with the State that McCandless's arguments rest on her belief that additional evidence of her mental state would have assisted her claim that her statements were involuntary. However, even if she had presented additional evidence regarding her mental state, her claim would have still failed based on her inability to establish coercive or improper police conduct. *See Vice*, 397 Wis. 2d 682, ¶38. Defense counsel's failure to submit additional evidence to

support a meritless claim is not deficient performance. *See **Wheat***, 256 Wis. 2d 270, ¶14. The circuit court properly denied a hearing on this claim.

### III. Journal entries

¶54 McCandless next challenges the circuit court's evidentiary ruling regarding Woodworth's journals, stating that the court erred by restricting the jury's consideration of additional journal entries. Based on the record, Woodworth's journals contained references to sexual, homicidal, and suicidal thoughts. She explains that "the journals were relevant to corroborate [her] testimony about Mr. Woodworth's conduct during the incident, and could properly be considered for that purpose." According to McCandless,

> [Woodworth's] mental state was relevant to corroborate Ms. McCandless'[s] testimony that he initiated the attack. In turn, the fact that Mr. Woodworth attacked Ms. McCandless is a critical fact with respect to the elements of her self-defense claim, supporting her reasonable belief that she was in imminent danger of death or great bodily harm and that the force she used was necessary to fend off the attack.

¶55 "It is … well established that admissibility of evidence proffered to show the reasonableness of the self-defense claim is within the circuit court's discretion." *State v. McClaren*, 2009 WI 69, ¶21, 318 Wis. 2d 739, 767 N.W.2d 550.[13] We "will uphold a circuit court's evidentiary ruling if it 'examined the relevant facts, applied a proper standard of law, used a demonstrated rational

---

[13] The State asserts that McCandless incorrectly argues that the standard of review on this issue is de novo. In her reply, McCandless does not specifically challenge the State's assertion that we review the court's decision for an erroneous exercise of discretion, and she appears to concede that erroneous exercise of discretion is the correct standard.

process and reached a conclusion that a reasonable judge could reach.'" ***State v. Hurley***, 2015 WI 35, ¶28, 361 Wis. 2d 529, 861 N.W.2d 174 (citation omitted).

¶56 Prior to trial, McCandless moved to present certain journal entries as evidence of Woodworth's "character, reputation, behavior, statements, and specific acts." In order to support her self-defense claim, she focused on passages in the journals suggesting that Woodworth was violent or that he condoned nonconsensual sex. She sought to introduce them as ***McMorris*** evidence, *see* ***McMorris v. State***, 58 Wis. 2d 144, 205 N.W.2d 559 (1973), and as evidence of a pertinent character trait of Woodworth's pursuant to WIS. STAT. § 904.04(1)(b) and (2)(a).

¶57 The circuit court partially granted McCandless's motion. It allowed her to introduce the following evidence: (1) Woodworth's writings that McCandless "was actually aware of when she stabbed" him and which she testified "contributed to her perception of [the] danger [Woodworth] posed to her," and (2) Woodworth's character trait for violence through opinion or reputation evidence. However, the court refused to permit McCandless to use the journal entries as evidence of Woodworth's character for violence "to support an inference about the victim's actual conduct during the incident." *See* ***State v. Head***, 2002 WI 99, ¶¶127-28, 255 Wis. 2d 194, 648 N.W.2d 413.[14]

---

[14] In ***McMorris v. State***, 58 Wis. 2d 144, 205 N.W.2d 559 (1973), our supreme court explained that

(continued)

27

¶58 On appeal, McCandless maintains that "[t]he circuit court erroneously limited the purpose for which the jury could consider Mr. Woodworth's journals, and erroneously excluded any journal entries that Ms. McCandless was not personally aware of." She argues that the journal entries were not character evidence; instead, they were admissible hearsay related to Woodworth's "then existing thoughts and feelings" under WIS. STAT. § 908.03(3). In the alternative, if the journal entries were character evidence, then McCandless argues they were admissible as other-acts evidence under WIS. STAT. § 904.04(2)(a).

¶59 We conclude that the circuit court did not erroneously exercise its discretion by limiting evidence of Woodworth's journal entries because the additional journal entries were not relevant for the purposes argued by McCandless.[15] First, WIS. STAT. § 908.03(3), which is a hearsay exception that addresses a "[t]hen existing mental, emotional, or physical condition," applies to "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and

---

> [i]n criminal actions, when the reputation or character of the victim in the assault cause is not directly in issue, evidence thereof is not relevant. However, in trials for homicide or assault in which the issue of self-defense is sufficiently raised, evidence of the turbulent and dangerous character or reputation of the deceased or the victim of the assault is relevant in determining whether the victim or the accused was the aggressor, and as bearing on the reasonableness of the defendant's apprehension of danger at the time of the incident.

*McMorris*, 58 Wis. 2d at 149 (footnotes omitted). Further, "when the defendant seeks to introduce such evidence to establish his [or her] state of mind at the time of the affray, it must be shown that he [or she] knew of such violent acts of the victim prior to the affray." *Id.* at 152.

[15] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01.

bodily health," but the exception does not include "a statement of memory or belief to prove the fact remembered or believed."

¶60    Even if we assume, without deciding, that Woodworth's additional journal entries fit within this hearsay exception, we conclude that the circuit court did not err.  We agree with the State's assertion that McCandless is attempting to use WIS. STAT. § 908.03(3) to "circumvent" both WIS. STAT. § 904.04(1) and *McMorris*.  Section 904.04(1) generally bars "[e]vidence of a person's character or a trait of the person's character … for the purpose of proving that the person acted in conformity therewith on a particular occasion."  Likewise, "[a]s a general rule, *McMorris* evidence may not be used to support an inference about the victim's actual conduct during the incident."  *Head*, 255 Wis. 2d 194, ¶128.  The exception is when the issue of self-defense is before the jury.  *See id.*; *McMorris*, 58 Wis. 2d at 152.  Then, *McMorris* evidence that is "within [the defendant's] knowledge at the time of the incident," *see McMorris*, 58 Wis. 2d at 152, "may be admitted because it 'bear[s] on the reasonableness of the defendant's apprehension of danger at the time of the incident,'" *see Head*, 255 Wis. 2d 194, ¶128 (citation omitted).

¶61    McCandless sought to offer the journals to show Woodworth's propensity toward violence and preoccupation with the topics discussed in the journals in order to show that he would have hurt her.  In fact, she even argues that "[a] party is within the bounds of the law to argue that a person's expressions of their own thoughts and feelings are relevant to a determination of how they acted during a confrontation."  Using the journal entries, of which McCandless was not aware, to infer how Woodworth actually behaved on March 22, 2018, is not "within the bounds of the law."  It is prohibited character evidence, offered to show propensity, even when the information came from the subject individual.

¶62    Furthermore, the circuit court found that *Woodworth's* state of mind was not relevant to the elements of first-degree intentional homicide or to McCandless's self-defense privilege. *See **State v. Kutz***, 2003 WI App 205, ¶59, 267 Wis. 2d 531, 671 N.W.2d 660 ("[T]he issue of relevancy is distinct from the applicability of WIS. STAT. § 908.03(3)."). We agree. To prove first-degree intentional homicide, the State was required to establish that McCandless caused Woodworth's death and acted with the intent to kill him. *See* WIS. STAT. § 940.01. *Woodworth's* state of mind had no bearing on either of those questions. Further, while Woodworth's state of mind could generally be relevant to McCandless's self-defense claim,[16] the reasonableness of McCandless's beliefs for the purpose of the self-defense privilege could not have been impacted by journal entries *of which she was not aware* at the time of Woodworth's death. Thus, the journal entries that McCandless argues should have been submitted to the jury were irrelevant to the question of self-defense. We agree with the State and the circuit court that the relevance of the journal entries "pertained only to McCandless's 'perception of danger,' which necessarily meant that only journal entries of which she was personally aware could be admitted."

---

[16] WISCONSIN STAT. § 939.48(1), the self-defense statute, provides as follows:

> A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

¶63    Second, McCandless also argues that the journal entries were admissible as other-acts evidence under WIS. STAT. § 904.04(2).[17]  According to McCandless, she "does not dispute that to comply with … § 904.04(2)(a) the journals could not be used to argue that Mr. Woodworth acted in 'conformity' with his writings."  She asserts, however, that "Woodworth's preoccupation with violence and sacrifice—and fixation on Ms. McCandless—is evidence that could be used for multiple permissible purposes, including motive and intent to harm Ms. McCandless and himself, and a plan to do so."  *See* § 904.04(2)(a).

¶64    We also agree that the circuit court reasonably exercised its discretion by declining to admit Woodworth's journal entries as other-acts evidence under WIS. STAT. § 904.04(2)(a).  Even if the journal entries could be accepted for an admissible purpose—such as motive, intent to harm, or a plan—they would still fail the relevancy prong for the reasons discussed above.  *See State v. Curtis Jackson*, 2014 WI 4, ¶59, 352 Wis. 2d 249, 841 N.W.2d 791.  Further, the journal entries would "invite … an improper propensity inference."  *See id.*, ¶84.  Thus, the additional journal entries fail the test in *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998).  For these reasons, the circuit court did not erroneously exercise its discretion by declining to admit all of Woodworth's journal entries.

---

[17] Evidence of other crimes, wrongs, or acts—i.e., other-acts evidence—is not admissible to prove that a person acted in conformity with a particular character trait but may be admitted "when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  WIS. STAT. § 904.04(2)(a).  To make that admissibility determination, we apply the three-prong test from *State v. Sullivan*, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998), which provides that "other-acts evidence is admissible if (1) it is offered for a permissible purpose under … § 904.04(2)(a); (2) it is relevant under WIS. STAT. § 904.01; and (3) its probative value is not substantially outweighed by the risk of unfair prejudice under WIS. STAT. § 904.03."  *State v. Dorsey*, 2018 WI 10, ¶39, 379 Wis. 2d 386, 906 N.W.2d 158.

## IV. Closing arguments

¶65    McCandless next asserts that the State's closing arguments violated her right to due process because the State made "inflammatory and improper" statements.  Generally, a prosecutor "is allowed considerable latitude in closing arguments," and the circuit court has discretion to determine the propriety of the argument.  *State v. Burns*, 2011 WI 22, ¶48, 332 Wis. 2d 730, 798 N.W.2d 166. "A 'prosecutor may comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces him and should convince the jurors.'"  *Id.* (citation omitted).  "The line between permissible and impermissible argument is drawn where the prosecutor goes beyond reasoning from the evidence and suggests that the jury should arrive at a verdict by considering factors other than the evidence."  *State v. Neuser*, 191 Wis. 2d 131, 136, 528 N.W.2d 49 (Ct. App. 1995).

¶66    To decide "whether a prosecutor's statements necessitate a new trial in the interest of justice, the test applied is whether the statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Burns*, 332 Wis. 2d 730, ¶49 (citation omitted).  "Even if there are improper statements by a prosecutor, the statements alone will not be cause to overturn a conviction.  Rather, the statements must be looked at in context of the entire trial." *Id.* (citation omitted).  Whether an improper closing argument has created a due process violation is a question of law that we review de novo.  *See State v. Luedtke*, 2015 WI 42, ¶37, 362 Wis. 2d 1, 863 N.W.2d 592.

¶67    First, McCandless argues that the State's comments "improperly disparaged defense counsel by arguing that counsel called experts who were 'hired guns' and were trying to 'distract from the truth.'"  Specifically, she identifies the

State's reference to Benson as a "hired gun" with "an ax to grind" and "an agenda in the case."

¶68 We agree with the State that the prosecutor did not act improperly by making these remarks. The State reasonably argued that Benson was biased, and McCandless presents no binding case law stating that a witness's bias is an improper subject for closing argument.[18] Instead, the bias of any witness is relevant to that witness's credibility. *See Rogers v. State*, 93 Wis. 2d 682, 689, 287 N.W.2d 774 (1980) (discussing the "five main lines of attack on the credibility of a witness," with the second being "an attack … showing that the witness is biased"); *State v. Adams*, 221 Wis. 2d 1, 17, 584 N.W.2d 695 (Ct. App. 1998) ("[A] prosecutor is permitted to comment on the credibility of witnesses as long as that comment is based on evidence presented.").

---

[18] McCandless cites two cases in support of her position: *Horgen v. Chaseburg State Bank*, 227 Wis. 510, 279 N.W. 33 (1938), and *Commonwealth v. Bishop*, 963 N.E.2d 88 (Mass. 2012). McCandless cites *Horgen* for the general statement that "[i]n the absence of evidence warranting derogatory statements involving the credibility of a witness, his [or her] good character and honesty as a party to the transaction should be free from such attacks." *See Horgen*, 227 Wis. at 516. As we explain below, the State's comments here *were* based on the evidence in the case.

*Bishop* is both a case from another jurisdiction and is materially distinguishable on its facts. For example, in *Bishop*, the prosecutor discussed the defense expert's specific billing rate and then stated, "[I]t so happens that he's able to come up with something that's helpful to the defense." *Bishop*, 963 N.E.2d at 98. The Supreme Judicial Court of Massachusetts agreed that "[e]vidence of an expert's billing rate is admissible as evidence of bias and it is appropriate to remind the jury that an expert was retained by the defendant," but the court stated that "it is improper for a prosecutor to suggest that an expert witness's testimony was 'bought' by a defendant or to characterize the witness as a 'hired gun' where, as here, there was no evidence that he was paid more than his customary fee." *Id.* (citation omitted). Regardless, the court concluded that the prosecutor's comment "did not create a substantial likelihood of a miscarriage of justice." *Id.* Here, the State simply used Benson's own words to reiterate that he was hired by the defense and was motivated by that fact.

¶69 In this case, Benson was specifically cross-examined on whether the defense "hired" him to complete the assessments, provide the reports, and appear in court. These questions were all fair game for cross-examination. Then, on rebuttal, defense counsel inquired whether Benson's opinions were "based in any way on money," and Benson responded, "No. I want to be very clear about that. I'm not a paid hired gun, I'm not a mercenary, and that would be very unethical. That's not why I do this."

¶70 Thus, the prosecutor's comment—which claimed that Benson "gratuitously add[ed] the statement, I'm not a hired gun, when nobody asked if he was or wasn't a hired gun … he just blurts it out" and stated that "[h]e actually acted a heck of a lot like a hired gun … on cross-examination"—was directly in response to evidence presented by Benson as a result of a question from the defense. The prosecutor went on to identify instances in Benson's testimony where he "chang[ed] the question so he [did not] have to actually answer that question." As a result, the prosecutor concluded that Benson's evasiveness made him "sound[] like someone who has an ax to grind in the case, someone who has an agenda in the case." Under these circumstances, we conclude that the State's comments were all grounded in Benson's own testimony, i.e., the evidence.[19]

¶71 McCandless also argues that the State "improperly disparaged" Dr. Richard Tovar, another expert hired by the defense, by stating that "he writes his report in such a way that it sounds like he's supporting everything the defendant says. But when you actually ask him questions, well, yeah, no" because

---

[19] During the postconviction proceedings, the circuit court also found that Benson "did not seem like … an unbiased witness," and the court stated, "I'll just note that [in] his cross-examination, he appeared to be … 'dodgy.'"

he provides different explanations. This statement, too, questions the witness's credibility and is appropriately based on the evidence in the record. As the State recounts,

> Tovar testified that McCandless's cutting wounds were consistent both with being inflicted by another or self-inflicted. However, his report referred to these injuries as consistent only with being inflicted by an assailant. Similarly, Dr. Tovar wrote in his report that Woodworth's injuries were consistent with being inflicted by someone acting in self-defense, even though he agreed at trial that they could have been inflicted by someone acting with "homicidal rage."

Accordingly, we conclude that, in the case of the State's comments about both Benson and Tovar, the State permissibly gave an opinion that "was based on evidence before the jury." *See Mayo*, 301 Wis. 2d 642, ¶45.

¶72    Second, McCandless argues that "the State blatantly accused defense counsel of deceiving the jury by trying to 'distract from the truth'" and, further, engaged in improper rebuttal argument by stating, "The defense hired professionals to try and explain away the defendant's repeated lies and tried to make the facts in this case fit." She further identifies that the State "used the term 'distract you' six more times, thoroughly infecting its closing with an attack on defense counsel's character." McCandless calls the State's comments "more egregious than statements that our supreme court deemed improper in" *Mayo*. There, the State told the jury "that defense counsel's job is to 'get his client off the hook. That's his only job here, not to see justice is done but to see that his client is acquitted.'" *See id.*, ¶17.

¶73    We disagree with McCandless's characterization of the State's comments.   At most, the State was commenting on the truthfulness of McCandless's testimony based on, and in relation to, the State's evidence. *See*

*State v. Darron Jackson*, 2011 WI App 63, ¶29, 333 Wis. 2d 665, 799 N.W.2d 461 ("Accusing a witness of lying, based on the evidence, is not even close to being beyond the pale."); *see also* *Embry v. State*, 46 Wis. 2d 151, 160, 174 N.W.2d 521 (1970) (noting that in Wisconsin, "when such an opinion is expressed [by either counsel] it must be clear that it is based solely upon the evidence in the case"). Thus, we agree with the State that "[t]hese remarks amounted to nothing more than an assertion that the jury should give more weight to the State's evidence than the defense's evidence." Moreover, by stating that the defense was trying to "distract from the truth," the State was reminding the jury "not to search for doubt." Thus, we conclude that the State's comments did not constitute an "attack" on defense counsel's character, and the comments did not exceed the prosecutor's "considerable latitude." *See* *Burns*, 332 Wis. 2d 730, ¶48.

¶74 Third, McCandless argues that the State engaged in improper vouching when it claimed that Tillotson was "the only doctor who testified here who wasn't being paid" and that "[a]ll he's trying to do every single day, and all he was trying to do in this case, was help his patient, who was the defendant. And he told you … his opinion is [that] these injuries are self-inflicted."

¶75 While vouching for a witness's credibility based upon one's own experience that something is true or accurately described is improper, *State v. Smith*, 2003 WI App 234, ¶26, 268 Wis. 2d 138, 671 N.W.2d 854, that is not what

occurred here.[20]  The State simply argued to a conclusion—i.e., that the jury should find Tillotson's testimony credible—based on the evidence in the record. *See State v. Lammers*, 2009 WI App 136, ¶16, 321 Wis. 2d 376, 773 N.W.2d 463; *Adams*, 221 Wis. 2d at 17.  The State appropriately referenced the evidence that Tillotson was the only doctor not being paid to testify; that Tillotson testified pursuant to a subpoena because he was McCandless's treating physician in the emergency department; and that because Tillotson was McCandless's doctor, his conclusions about her injuries were related to diagnosing and treating her. Further, Tillotson specifically testified that "my job is to take care of this patient who has been through some type of event or ordeal, depending on whether it's a heart attack, car accident, or alleged sexual assault."  Thus, there was an evidentiary basis for the State's comments.  The comments were not vouching, but instead, they directed the jury to consider the evidence supporting Tillotson's testimony and opinions.

¶76   Even if we were to conclude that one or more of the above-identified comments were improper, we would not agree that any alleged error(s), in the "context of the entire trial," "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *See Burns*, 332 Wis. 2d 730, ¶49 (citation omitted).  All of the comments that McCandless has identified were based on evidence in the record and were a minor part of the State's overall

_____

[20] In *State v. Smith*, 2003 WI App 234, 268 Wis. 2d 138, 671 N.W.2d 854, the State vouched for police witnesses saying, "[T]hey work hard.  They do a tough job.  They come in here to testify a lot of times.  They work long, long hours.  You weigh their testimony against the defendant's."  *Id.*, ¶12.  We concluded that these statements were improper because "there is no evidentiary basis for the officers' work habits or job demands, or the basis for the prosecutor's *knowledge* of them.  This portion of the prosecutor's closing argument unfairly referenced matters not in the record and vouched for the credibility of the police witnesses."  *Id.*, ¶26.

closing argument. Further, any prejudicial effect was mitigated by the pattern jury instruction informing the jury that counsels' "arguments and conclusions and opinions" within closing arguments "are not evidence." WIS JI—CRIMINAL 160 (2000); *see also State v. Gary M.B.*, 2004 WI 33, ¶33, 270 Wis. 2d 62, 676 N.W.2d 475 ("When a circuit court gives a proper cautionary instruction, appellate courts presume that the jury followed that instruction and acted in accordance with the law."). Any of the State's allegedly improper remarks during closing arguments did not so infect McCandless's trial with unfairness so as to deprive her of a fair trial.

## V. Jury instruction

¶77 Finally, McCandless argues that "the jury was provided an erroneous jury instruction that improperly limited [its] ability to consider the psychological evidence." (Formatting altered.) In determining whether or not an instruction correctly states the law, we will review the jury instructions "as a whole" to determine whether the overall meaning is correct, *State v. Langlois*, 2018 WI 73, ¶38, 382 Wis. 2d 414, 913 N.W.2d 812 (citation omitted), which is a question of law, subject to our de novo review, *State v. Austin*, 2013 WI App 96, ¶6, 349 Wis. 2d 744, 836 N.W.2d 833.

¶78 McCandless admits, however, that her defense counsel failed to object to the jury instruction at the jury instruction conference. Generally, the failure to request, or object to, a jury instruction results in the forfeiture of any challenges to the instructions on appeal. *See Austin*, 349 Wis. 2d 744, ¶20. Nevertheless, a claimed error in the jury instructions forfeited by defense counsel may be reviewed under a claim of ineffective assistance of counsel. *Id.*

¶79    As discussed above, the jury heard expert testimony from two defense witnesses: Dr. Benson and Dr. Hopper.  Benson testified regarding his diagnoses of McCandless—which included PTSD, with depersonalization and derealization, and persistent depressive disorder with anxious distress—and explained that those conditions explained her lack of responsiveness in her interviews with law enforcement.  Hopper, for his part, described how the brain responds to trauma.  He also outlined the concept of "survival reflexes," which can lead to "a very extreme response."

¶80    Given the psychological testimony, the circuit court stated it had a "big concern" that the jury may be confused.  It determined that the jury "ha[d] to be told" "how they can use [the psychological] evidence" and that a not guilty by reason of mental disease or defect (NGI) defense was "not an issue in th[e] case."[21]  Thereafter, the parties agreed upon a nonpattern jury instruction, which was a combination of two standard instructions: Wis JI—Criminal 275 and 605. The instruction provided as follows:

> You have heard evidence about Ezra McCandless's mental condition at or around the time of the offense, specifically on the issue of her memory.
>
> You may not consider that evidence to conclude Ezra McCandless is not responsible for the offense by reason of mental disease or defect and therefore not guilty of the offense.
>
> First, this is not a mental responsibility case.  There is no plea in this case that, under Wisconsin law, puts mental responsibility in issue.  In Wisconsin, the legal term for this defense is known as "not responsible by reason of mental disease or defect."  However, Ezra McCandless is not raising such a defense.  Therefore, you must not use or

---

[21] An NGI trial is bifurcated into two phases: the guilt phase and the responsibility phase. *See* **State v. Fugere**, 2019 WI 33, ¶26, 386 Wis. 2d 76, 924 N.W.2d 469.

consider the psychological evidence on the ultimate issue of guilty or not guilty. Psychological evidence has been received by the court, but you may only consider this evidence on the following issues:

> 1. You may consider the psychological evidence on the issue of whether Ezra McCandless suffered from a condition that presented barriers for her to encode, store, or retrieve memories or an involuntary response that interfered with her ability to remember.

> 2. You may also consider psychological evidence on the issue of self defense. You may consider such evidence when deciding whether either Ezra McCandless's belief that she was in imminent danger of death or great bodily harm or her belief that the amount of force used was reasonable.

> You may consider this evidence only for the purposes I have described, giving it the weight you determine it deserves.

*See* WIS JI—CRIMINAL 275 (2018); WIS JI—CRIMINAL 605 (2011).

¶81 On appeal, McCandless contends that her defense counsel performed deficiently by not objecting to the instruction because it "limited the jury's consideration of the psychological evidence."[22] She asserts that the instruction was erroneous because this was not an NGI case, so the instruction was irrelevant and, therefore, "imported an irrelevant theory of the case," which "would only cause confusion and lead a jury to be reluctant and overly-cautious about giving weight to the psychological evidence." Further, she contends that "the instruction improperly limited the jury's ability to consider the psychological evidence," which "effectively lowered the State's burden of proof." McCandless explains that the psychological evidence "was relevant to determining whether or not the

---

[22] At the *Machner* hearing, McCandless's defense counsel testified that they did not recall considering objecting to the instruction, but they stated that they should have because the psychological evidence could properly be considered for other purposes.

State proved the mens rea of the charged offense" and the lesser-included offenses and was relevant to her claims of perfect and imperfect self-defense. *See* WIS JI—CRIMINAL 1010 (2000); WIS JI—CRIMINAL 1022 (2015); WIS. STAT. § 940.01(1)(a), (2)(b); WIS. STAT. § 939.48(1); ***Head***, 255 Wis. 2d 194, ¶¶70, 84-91.

¶82    We conclude that defense counsel did not perform deficiently by failing to object to the proposed jury instruction.[23]  McCandless first contends that the NGI component of the jury instruction "imported an irrelevant theory" because "this was not an NGI case."  That is precisely what the jury was informed in the first part of the instruction.  Therefore, the reference to the NGI component was not erroneous as a matter of law, and McCandless presents no legal authority to the contrary.

¶83    Further, the NGI component of the jury instruction was not irrelevant.  Because this *was not* an NGI case, the jury likely would have been unaware of the traditional bifurcated nature of such a trial.  Thus, the circuit court was reasonably concerned that the psychological evidence would confuse the jury and that the jury could raise the NGI issue on its own in deliberations, as the jury

---

[23] Initially, we note that the record in this case actually suggests that rather than simply failing to object to the proposed jury instruction, defense counsel helped to draft a slightly modified version of the instruction that the circuit court accepted.  Thus, we agree with the State that McCandless "is really challenging [defense] counsel's execution of trial strategy" because rather than object to the instruction, defense counsel appeared to approve of the instruction once the proposed modification had been accepted.  We do not review the reasonableness of trial counsel's decisions with "the benefit of hindsight," ***State v. Pico***, 2018 WI 66, ¶22, 382 Wis. 2d 273, 914 N.W.2d 95, and we cannot decide after-the-fact that "a more appropriate decision could have been made," ***State v. Felton***, 110 Wis. 2d 485, 502-03, 329 N.W.2d 161 (1983).  Further, we will not "second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." ***State v. Breitzman***, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93 (alteration in original; citation omitted).

cannot be expected to follow law that it is not told about. Rather than being irrelevant, the instruction provided important clarification.

¶84 Next, McCandless argues that the second component of the instruction erroneously limited the use of the psychological evidence because the evidence was admissible for the purpose of determining whether the State had established her intent. However, citing *Steele v. State*, 97 Wis. 2d 72, 294 N.W.2d 2 (1980), the State argues that "Wisconsin law barred McCandless from using the psychological evidence to argue that she lacked the requisite *mens rea*." In *Steele*, our supreme court stated that "repeated reasoned statements of this court have amply demonstrated a sufficient state justification for the exclusion of expert opinion testimony on mental capacity to form an intent in the guilt phase of a bifurcated [NGI] trial." *Id.* at 85. According to the *Steele* court, this evidence is "neither competent, relevant, nor probative for the purpose asserted." *Id.* at 97.

¶85 Later, we applied *Steele* in *State v. Morgan*, 195 Wis. 2d 388, 536 N.W.2d 425 (Ct. App. 1995). Morgan argued "that the [circuit] court erred in excluding expert testimony on [PTSD] and expert and lay testimony on her psycho-social history from the guilt phase of her trial." *Morgan*, 195 Wis. 2d at 413. We affirmed the exclusion of expert testimony regarding Morgan's PTSD from the guilt phase of Morgan's bifurcated trial for the purpose of showing that she possessed the necessary intent for the crime. *Id.* at 416-24. We explained that Morgan asserted that her PTSD "caused her to re-experience past traumatic events 'in such a way as to cause [her] to experience a dissociative state or flashback,'" but we concluded that the evidence was irrelevant because "[t]he alleged fact that Morgan was in a dissociative state does not carry with it the automatic supposition that while in the dissociative state she did not have the specific intent to kill [the victim]." *Id.* at 422-24 (first alteration in original); *see also Morgan v. Krenke*,

42

232 F.3d 562, 569 (7th Cir. 2000) (reviewing *Morgan* on federal habeas corpus and concluding that "for Wisconsin to exclude psychiatric testimony on the capacity to form intent is within its power" and that evidence of "mental diseases, which some might think would cast doubt on [a defendant's] ability to form the intent necessary to commit a crime, can be precluded … during the guilt phase").

¶86 Here, the circuit court specifically recognized that *Morgan* barred the use of psychological evidence on the issue of intent. Given the testimony of the expert witnesses, the circuit court was reasonably concerned that the jury might believe it had to decide whether McCandless was capable of forming the necessary intent or acting with utter disregard for human life due to her mental condition, rather than using the evidence to determine the reasonableness of her response to Woodworth's alleged attack. Thus, the instruction that the jury could not consider evidence about McCandless's mental condition "to conclude [that she] is not responsible for the offense by reason of mental disease or defect and therefore not guilty of the offense" was not an inaccurate statement given the case law, and defense counsel did not perform deficiently by not objecting to that instruction.

¶87 In reply, McCandless argues that *Steele* is inapplicable because this is not an NGI case and that *Morgan* "rejected an over-broad interpretation of *Steele* to non-NGI cases." McCandless "agrees," however, "that an expert cannot opine on whether she was 'incapable' of forming intent." Nevertheless, she argues that "the jury should have been free to rely on the psychological evidence when making inferences and reaching its own determination on intent." This argument appears to be, at best, unduly nuanced and perhaps inconsistent—i.e., McCandless is arguing that the expert cannot testify as to her capability to form intent, but the

jury can nevertheless consider whether she was capable of doing so based on her psychological state.

¶88 As demonstrated by the case law and McCandless's specific arguments above, this area of law, as applied to non-NGI cases, is, at the very least, unclear or unsettled. *See Morgan*, 195 Wis. 2d at 424 (stating that "the subsequent admissibility of expert testimony" based on evidence of PTSD and "syndromes related to or derived from [it]" "is not as clearly established as [the defendant] would lead us to believe"). Under prevailing professional norms, defense counsel is not required to take action in an area where the law is unsettled. *See State v. Hanson*, 2019 WI 63, ¶29, 387 Wis. 2d 233, 928 N.W.2d 607.

¶89 Finally, McCandless asserts that "the jury was instructed that it could 'only' consider the evidence on issues of memory and 'when deciding whether Ezra McCandless'[s] belief that she was in imminent danger of death or great bodily harm or her belief that the amount of force used was reasonable.'" She argues that the evidence was also relevant to whether she actually had those beliefs, and, as a result, the instruction "effectively cut off consideration of the psychological evidence for evaluating imperfect self-defense."

¶90 We disagree with McCandless's understanding of the jury instruction. The instruction unequivocally informed the jury: "You may also consider psychological evidence on the issue of self defense." The jury was never informed that it could not consider the psychological evidence to determine whether McCandless actually held certain beliefs with regard to her imperfect self-defense claim.

¶91 Ultimately, defense counsel failed to object to a proposed jury instruction that satisfied the circuit court's evidentiary concerns in an ambiguous

area of law. Under these circumstances, defense counsel did not perform deficiently.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.